IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Karmaloop, Inc., et al.,[1] | ) | Case No. 15-10635 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF BRIAN L. DAVIES, JR IN SUPPORT OF FIRST DAY MOTIONS

I, Brian L. Davies, Jr., declare as follows:

1.      I have served as the interim Chief Financial Officer of Karmaloop, Inc., a Delaware corporation ("KL" or the "Company"), and am now engaged as the Chief Restructuring Officer of KL and Karmaloop TV, Inc., a Delaware corporation ("KLTV" and collectively with KL, the "Debtors"). I am familiar with the day-to-day operations and business and financial affairs of the Debtors, having been retained by the Company since December of 2014.

2.      I am the Managing Director at CRS Capstone Partners, LLC ("Capstone") and as such I have assisted companies and their stakeholders work through difficult operating and financial environments. I have nearly two decades of experience providing financial restructuring, interim management, due diligence, and forensic and operational consulting services to business organizations experiencing significant financial difficulties, both in and out of bankruptcy proceedings.

3.      With the assistance of the other members of Capstone, I have become directly involved in the Debtors' business operations and day-to-day functioning. I am, therefore,

---

[1]    The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Karmaloop, Inc. - 3934; KarmaloopTV, Inc. – 8230. The Debtors' address is 334 Boylston Street, Suite 500, Boston, MA 02116.

familiar with all aspects of the Debtors' affairs, including business operations, strategic planning, financial reporting, legal affairs and other relevant issues, including, but not limited to, the Debtors' efforts to address their current financial difficulties, and their preparation for the transition into operation as chapter 11 debtors-in-possession.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the United State Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of the Bankruptcy Code, thus commencing these chapter 11 cases (the "Cases"). To enable the Debtors to operate effectively, minimize disruption to their operations, and maximize the value of their assets, the Debtors have filed various applications and motions seeking immediate or expedited relief. Specifically, the following have been filed on behalf of the Debtors (collectively, the "First Day Motions").

    a.   Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral and Providing for Adequate Protection (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing (the "DIP Motion");

    b.   Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion").

    c.   Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages, Salaries and Bonuses, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and

(VI) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Compensation and Benefits Motion").

d. Debtors' Motion for Interim Order Under 11 U.S.C. §§ 105(A), 345, 363, 364, and 503(B)(1) Authorizing (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Continued Use of Existing Cash Management Systems (D) Waiver of Certain Guidelines Relating To Bank Accounts; and (E) Scheduling a Final Hearing (the "Cash Management Motion");

e. Motion of the Debtors for the Entry of an Order (A) Authorizing, but not Obligating, the Debtors to Remit and Pay Certain Taxes and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Taxes Motion");

f. Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving The Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");

g. Debtors' Motion for Order Under Bankruptcy Code Sections 105, 361, 362, 363, 1107(A) and 1108 Authorizing Debtors to Maintain Existing Insurance Policies and Pay All Policy Premiums and Continue Relationship with Insurance Brokers (the "Insurance Motion"); and

h. Debtors' Application for Appointment of Rust Consulting Omni Bankruptcy as Claims and Noticing Agent (the "Section 156(c) Application").

5.      This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support of additional motions that may be filed on or after the Petition Date.

6.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  As CFO and now CRO for the Debtors, I have

3

become familiar with the Debtors' day-to-day operations, business affairs, financial condition and books and records. My testimony herein is based on my service as an officer of the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me, at my request, by the Debtors' other officers and employees.

7.     After a brief Preliminary Statement, Part I of the Declaration describes the business operations and background of the Debtors and of these Cases. Part II sets forth the facts relevant to each of the First Day Motions.

## I.     PRELIMINARY STATEMENT

8.     The Company, founded in 1999, is a cross-platform digital commerce and media property company that specializes in the sale of global streetwear fashion and culture. The Debtors specialize in the sale of over 400 brands of apparel, shoes and accessories for men and women that are marketed to a specialized group of male and female customers ages 18-35. The Debtors operate their businesses entirely via an e-commerce business model, primarily using the web site www. karmaloop.com. The Company has had nearly 5 million monthly unique visitors, 2.2 million Facebook followers and 800,000 Twitter followers.

9.     The Debtors' businesses have fallen victim to the shift in retail purchasing that is occurring, especially among retailers in the young adult age bracket, as such consumers have moved away from purchasing traditional brands. Over the past few months, several other apparel retailers have filed for bankruptcy protection –Wet Seal, Deb Stores Holdings LLC, dELiA*s, Inc. and Cache. Further, other similar retailers like American Eagle and Abercrombie and Fitch are undergoing their own restructuring in light of such changing consumer trends. In addition to these industry-wide trends, the Debtors' financial performance was also adversely impacted by, *inter alia*, (a) a lack of capital to purchase sufficient inventory to meet demand, (b)

an inability to fully adapt to business strategies that result in better margin opportunities such as fast fashion private label and print-when-ordering manufacturing, and (c) over-ambitious expansion efforts. In December of 2014, the Debtors hired Capstone as financial advisor in hopes of effectuating a restructure of the business by seeking to change previous operations and lines that no longer proved profitable or as profitable as other business strategies available to the Debtors.

10.    Unfortunately, there was insufficient time to implement a grand strategic vision in time for the Holiday Season, which, along with the back-to-school season, is traditionally the Company's most profitable period. Although the Company turned to different sales strategies, they could not be fully implemented in time for the 2014 holiday season.

11.    KL is obligated under a senior secured prepetition credit facility pursuant and subject to that certain Amended and Restated Credit Agreement dated as of June 27, 2014 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Senior Credit Agreement"), by and among KL, as borrower, the lenders party thereto from time to time (collectively, the "Prepetition Senior Lenders"), and Comvest Capital II, L.P., as agent (in such capacity, "Prepetition Senior Agent") for the Prepetition Senior Lenders, and the other Loan Documents (as defined in the Prepetition Senior Credit Agreement) (collectively, "Prepetition Senior Facility"). KLTV has guaranteed the payment and performance of all of the obligations under the Prepetition Senior Facility. The Debtors are in default of their obligations under the Prepetition Senior Facility.

12.    Given the rapidly deteriorating liquidity position, the Debtors determined in their business judgment that the best means for salvaging the Debtors' brands and businesses was to file for chapter 11 relief and seek to sell all, or substantially all, of the Debtors' assets and

businesses as a going concern through a section 363 sale process ("Sale"). The Debtors believe that this is the best means to preserve value for their estates and creditors and thereby allow the Karmaloop brand to continue, as well as save the jobs of many of the Debtors' existing employees.

13.     In order to meet these objectives, the Debtors have requested, and the Prepetition Senior Lenders have proposed to provide, debtor-in-possession financing to the Debtors pursuant and subject to that certain Debtor-In-Possession Credit Agreement (as the same may be amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among KL, as borrower, the lenders party thereto from time to time (collectively, the "DIP Lenders"; together with the Prepetition Senior Lenders, the "Senior Lenders"), and Comvest Capital II, L.P., as agent (in such capacity, "DIP Agent"; together with Prepetition Senior Agent, "Senior Agents") for the DIP Lenders, the other Loan Documents (as defined in the DIP Credit Agreement), and the other agreements, documents, instruments, and orders that may be entered or entered into, as the case may be, in connection therewith (collectively, the "DIP Facility"; together with the Prepetition Senior Facility, the "Senior Facilities"), subject to Court approval.

14.     In addition, ComCap Acquisition LLC, a Delaware limited liability company (and together with its successors, assigns, and designees, the "Stalking Horse"), which is an affiliate of one or more Prepetition Senior Lenders, has provided the Debtors with an offer (such offer, the "Stalking Horse Bid") to purchase substantially all of the Debtors' assets in the form of, and subject to the terms and conditions of, that certain Asset Purchase Agreement (as the same may be amended, supplemented, or otherwise modified from time to time, "Stalking Horse APA"), by and among Debtors and Stalking Horse, and the other agreements, documents, instruments, and

orders to be entered or entered into, as the case may be, in connection therewith (collectively, the "Stalking Horse Sale Documents"), subject to Court approval.

15.     The Debtors intend to conduct a fulsome sale and auction process under section 363 of the Bankruptcy Code to maximize the value of the Debtors' assets for the benefit of their estates and creditors.

## II.     BACKGROUND

### A.     Overview of the Debtors.

16.     KL was founded in October of 1999, originally as Karmaloop, LLC, under the vision of its founder and CEO Gregory Selkoe.  Mr. Selkoe, an early pioneer in the then nascent e-commerce business, utilized social media to grow and expand the business.  Although the Company did once operate a traditional brick and mortar store, that store closed by 2007, as the Company focused on internet sales.  KL utilizes various commerce platforms that are tailored to individual customer needs across distinct market sectors.  The Karmaloop business lines carry over 400 brands of apparel, shoes and accessories for sale to men and women.  The Company's basic business model has been to purchase select and hard to find streetwear and urban clothing lines at wholesale and sell them at retail to its customers.

17.     The Company has used four platforms to promote its business model.  The Karmaloop platform distributes brands that are created by their verge culture superstars and celebrities as well as private labels in which Karmaloop has extensive involvement.  The Plndr.com business line is a members-only online sale site that hosts limited time sales offering the best in premium streetwear apparel, shoes and accessories at prices up to 80% off retail.  The Kazbah line offers a dedicated marketplace for up and coming brands, many of which are created by the Debtors' customers.  This site allows commerce opportunities to these brands with the potential to have them moved to the Karmaloop.com site.  Finally, the Debtors are a popular

video content provider that displays advertising and other media products targeted to the Debtors' target demographics.

18.     In 2012, the Company purchased Mark Urban Holding ApS, a European online retailer of similar clothing lines, to increase the Company's international presence. Having a European operation enabled the Debtors to address international trade and finance issues such as tariffs and customs, as well as shipping and European-only distribution.

19.     KLTV presently has no assets or operations. It was originally created as an online website to produce content.

**B.      The Debtors' Business Operations.**

**(1)      Employees and Sales.**

20.     As of the Petition Date, the Debtors employed approximately 88 full time individuals and 3 individuals on a part time basis in the United States, including the states of Massachusetts, New York, Kentucky, Indiana, and Nevada. The Debtors no longer operate in any traditional brick and mortar storefronts, although its European subsidiaries do maintain physical stores. The executive office is located in Boston, MA.

21.     The Company's business is seasonal in nature. While the holiday season is certainly its busiest selling season sales wise, the Company also derives a consistent share of its sales during the back-to-school season.

**(2)      The Karmaloop Brand and Experience**

22.     The Debtors pride themselves on not just providing an e-commerce site for the sale of apparel, but also for promoting a lifestyle. The Debtors' platforms develop not only brand loyalty, but also unparalleled customer loyalty from the product of content and the promotion of community, in addition to its e-commerce business. The Debtors offer over 400 generally hard-to-find brands that appeal to the target demographic, as well as certain private

label brands that can only be found for sale on the Debtors' website.  Nearly 60% of the Debtors' sales derive from the sale of t-shirts, sweatshirts, sneakers and hats.  While the Company does carry lines of clothing that appeal to the teen and young adult women market, at present the bulk of its customers are male.

23.    The Debtors' competitors have traditionally been similar apparel companies with a presence online as well as in traditional brick and mortar stores that appeal to the young adult market, such as Urban Outfitters.  Other online retail competitors include Zumiez, PacSun, DrJays.com and digitalgravel.com.

24.    The Company has an international portfolio of trademarks and domain names. The Company's marks include, but are not limited to, "Boylston Trading Company", "Brick Harbor", "Globaloop", "Guru Powered by Karmaloop", "Junglelife", "Karmaloop" "Karmaloop (stylized)", "Karmaloop TV", "Kazbah", "Kloop", "Kloop (stylized and/or with design)", Klothing Liberation Project", "KLP", "Miss KL", "MissKL", "Monark", "Monark Karmaloop Elite", "O (stylized and/or with design)", "Orisue", "Plndr", "Shop. Party. Play", "Sons of Liberty", "Sons of Liberty (w/ design)", "Spool & Thread", "StreetAmmo", "The Daily Loop", and "The Kelly Show". The Company also own more than 200 domain names.

### (3)    Marketing Activities.

25.    The Debtors employ a multi-faceted marketing strategy to reach their target demographic, which has proved hard-to-reach and hard-to-please.  The Debtors use the following strategies:

   a.    The Rep Program.  The Debtors cultivate strong customer loyalty and as such they have a marketing force of over 250,000 "customer evangelists" who promote the Debtors' businesses through social media and events.

b.  Partnerships.  The Debtors utilize mutually beneficial marketing partnerships, promotions and contests with various popular musicians and web sites.

c.  Social Media.  The Debtors maintain a unique presence on social media and have utilized their various platforms to serve as a launch pad for viral promotions, user-generated content and direct contact.

d.  Celebrity Involvement.  The Debtors regularly maintain close relations with leading verge culture personalities that regularly promote the Karmaloop brand including Pharrell Williams, ASAP Rocky, Steve Aoki, Kendrick Lamar & The Weekend.

e.  E-Mail Newsletter.  The Debtors reach over 5 million people (all opt-in email subscribers) several times a week with its content newsletter, which offers exclusive promotions, product highlights, contests and sneak peaks.

f.  Events.  The Debtors sponsor various art installations, concerts and exclusive parties that serve to promote the Karmaloop brand.

**(4)   Vendors.**

26.    The Debtors have developed a network of over 600 brands that cater to their target 18-35 year old male customer base.  The Debtors do not have long-term contracts with any of their vendors at this time.  The Debtors also have produced private label brands that are only found on the Company's website.  The majority of the Company's products are provided by small labels that are not easily found in the traditional retail marketplace.

27.    Initially, the Company purchased the majority of the inventory to be sold to its customer up front, which was then sold on-line as well as through Amazon and eBay.  Recently, the Debtors have moved to a "dropship" model.  Under this model, customers purchase a product on the Company's website and provide payment to the Company.  The Company then contact the maker of such product, which then ships the product directly to the customer.  The Company keeps its share of the purchase price and remits the remainder to the dropship vendor.  Under this method, the Debtors lessen the risk of having unsold merchandise.

## C.    Organizational Structure.

28.    KL is a Delaware corporation. KLTV, which is a wholly owned subsidiary of KL, is also a Delaware corporation. KL owns 100% of Karmaloop Europe AG, a Swiss corporation and 37.9% of Society Clothing Company, LLC a Massachusetts limited liability company. Karmaloop Europe AG owns 100% of Karmaloop ApS and PLNDR.dk ApS, both Danish limited liability companies. Karmaloop ApS owns 100% of Streetammo ApS, a Danish limited liability company, Sneakershop.DK ApS, a Danish limited liability company, and Magic Blvd ApS, a Danish limited liability company.

## D.    Capital Structure.

### (1)    Senior Secured Debt.

29.    On or about August 24, 2012, Comvest Capital II, L.P. entered into that certain Credit Agreement with the Company, which was amended and restated pursuant to the terms of the Prepetition Senior Credit Agreement. The Debtors' obligations under the Prepetition Senior Facility are secured by, *inter alia*, a valid, first-priority continuing lien on, and security interest in, all of the Debtors' assets.

### (2)    Junior Secured Debt.

30.    The Debtors have two levels of junior secured debt, all of which are subordinated to the Prepetition Senior Lenders and the Prepetition Senior Facility. Eastward Capital Partners V, L.P. ("Eastward") provided two loans to the Debtors in the original aggregate principal amount of $10 million, all of which remains outstanding. Eastward was granted a junior and subordinated all-asset lien by the Debtors. There are several junior and subordinated secured lenders that hold a third lien position that all share on a *pari-passu* basis, the majority of which are maintained by that certain Fourth Amended and Restated Security Agreement dated June 27, 2014 (the "Agency Agreement") in which Greg Selkoe serves as Agent. All of the below

referenced loans remain outstanding and no principal paydowns have occurred. These lenders are:

    a. Insight Venture Partners VI, L.P, Insight Venture Partners (Cayman) VI, L.P. and Insight Venture Partners (Co-Investors) VI, L.P. in the original aggregate principal balance of $5 million;

    b. Insider Secured Bridge Loans in the original aggregate principal amount of $2,762,500.00; and

    c. Non-Insider Secured Bridge Loans in the original aggregate principal amount of $7,156,667.00.

    **(3)    Unsecured Debt.**

31.    In addition to trade debt, the Debtors owe various individuals and entities various amounts pursuant to unsecured promissory notes and loans. Such debt includes:

    a. A loan with Silicon Valley Bank originally made in May 29, 2013 in the original principal amount of $8 million, all of which remains outstanding.

    b. Various loans made by Insight Ventures Partners VI, L.P., Insight Ventures Partners (Cayman) VI, L.P. and Insight Venture Partners VI (Co-Investors), L.P. in the aggregate amount of $11 million. The Insight entities have loaned a total of $16 million, of which $5 million is secured (as referenced above).

    c. On December 16, 2011, KL guaranteed two loans in which Karmaloop ApS is the Borrower to Mark Urban Holding ApS, of which the aggregate principal amount outstanding is approximately $515,000.

    d. On April 1, 2012, the Debtors executed an unsecured promissory note in favor of Catherine McEnroe in the original principal amount of $1,758,200, of which approximately $908,200 of principal remains outstanding.

    e. In 2013 and 2014, the Debtors borrowed money in the form of unsecured non-insider bridge loans in the aggregate principal amount of $1,141,000.

32.    In addition to such unsecured debt as described above, the Debtors have accumulated a significant amount of accrued and unpaid trade and other unsecured debt in the ordinary course of their business, which as of the Petition Date amounted to approximately $19,000,000. The Debtors are presently subject to various collection suits from its vendors seeking payment of past due amounts.

(4)    **Equity Interests.**

33.    KL is a privately owned corporation with three tiers of equity ownership – 9,330,954 shares of Common Stock, 5,327,461 shares of Series A Preferred Stock and 180,268 shares of Series B Preferred Stock. The largest shareholders of Common Stock are owned by the CEO Mr. Gregory Selkoe, along with his family and family trusts established by them and the Debtors' GC and COO, Mr. Christopher Mastrangelo and his family and family trusts, although combined they own less than 50% of the common shares. Only two individual persons or entities own more than 10% of the KL's outstanding common stock: (i) Gregory Selkoe – 2,159,066 shares, 23.14%, and (ii) Allen Sneider – 1,391,387 shares, 14.91%.

34.    All of the Series A Preferred Stock is owned by the Insight Entities, while the Series B Preferred Stock is owned by five different individuals or entities. The Company has approximately 1 million warrants outstanding.

E.    **Events Leading To These Cases.**

35.    From 2008 to 2012, the Debtors' gross sales grew at a 40.9% Compound Annual Growth Rate ("CAGR"). In 2010, the approximate annual revenue was $60 million, in 2011 it was $91 million and in 2012 annual revenue was approximately $127 million. During this time, the Debtors experienced average gross margins in excess of 35%.

36.    Beginning in 2013, the Debtors began experiencing liquidity constraints, partially as a result of its various start-up businesses that drew resources away from the Debtors' core

ecommerce businesses and proved over ambitious in retrospect.  One of these ventures involved a cable television initiative in which Comcast was seeking minority owned businesses to produce a cable television channel.  The Company purchased content in preparation for this initiative and spent millions on, among other things, consultants, parties and operational foundation to obtain a license for the channel.  The Company's vision was to create a cross between a QVC type retail channel mixed with content that appealed to the Company's target demographic.  Ultimately, the Company was not awarded the channel after spending approximately $14 million on this initiative.

37.    The Company also sought to expand its other product lines, which proved ancillary to its core business.  For example, the Company introduced the Boylston Trading Company which offered higher end "Karmaloop brand" clothes to an older segment of the population who may have aged out of the Company's traditional offerings.  The Company was forced to shutter this platform as the price point proved too high to sustain it.

38.    The Company also sought to expand its women's line and spent time on the creation of a separate website, to be called "Miss KL".  The cost to produce this website was approximately $2 million, while at the same time the Company's women's sales shrank, a victim of the fast fashion retail trend that has caused similar retailers like Cache or Wet Seal to file bankruptcy.  Miss KL never launched.

39.    As a result of these ambitious expansion products, the Company experienced liquidity issues and, in the summer and fall of 2013, the Debtors approached the capital markets with the help of their prior investment bankers the Raine Group ("Raine")  For approximately 6 months, the Debtors and Raine contacted over 120 potential investors but were unable to consummate a capital transaction.  In December of 2013, the Debtors parted ways with Raine

and hired Consensus Advisory Services LLC and Consensus Securities LLC (collectively, "Consensus") to re-approach the capital markets to seek further capital contributions to support the Debtors.

40.     As a result of low margins and declining liquidity, the Debtors made a decision in 2014 to maximize liquidity at the expense of gross margin. The Debtors earmarked nearly $4 million in cash to pay interest and fees due and owing to the Prepetition Senior Lenders as well as to reduce or satisfy past due balances of approximately $14 million that was owed to various key vendors such as Google and eBay Enterprises.

41.     Beginning in January 2014, Consensus approached over 160 parties about investing in the Debtors. While many of these conversations were promising and resulted in several parties conducting due diligence, ultimately no capital transaction was consummated through Consensus' efforts. Beginning in the spring of 2014, the Company entered into various junior and subordinated secured bridge notes to shore up operations in advance of the back-to-school season and holiday retail season.

42.     Despite improvements and increased sources of cash, the Company breached certain of its financial covenants under the Prepetition Senior Facility. On October 2, 2014, the Prepetition Senior Agent sent that certain Notice of Events of Default and Reservation of Rights Letter notifying the Debtors of the existence of certain events of default under the Prepetition Senior Facility. On November 6, 2014, the Prepetition Senior Agent sent a Notice of Events of Default and Reservation of Rights Letter notifying the Debtors that additional events of default had occurred under the Prepetition Senior Facility. As a result, the Debtors and the Prepetition Senior Agent and the Prepetition Senior Lenders commenced discussions that resulted in the parties entering into that certain Forbearance Agreement dated November 25, 2014.

43.     As part of this forbearance process, the Debtors approached Consensus to manage a formal sale process once the full year 2014 results were known.  Although Consensus had some limited conversations with some potential strategic and financial acquirers in late December 2014, sales efforts did not begin in earnest until 2015.

44.     Consensus assisted in revising the Debtors' sale marketing materials and prepared updated financial information and projections and established an electronic data room to be available to all interested and qualified parties.  Prior to the Petition Date, Consensus again reached out to the capital markets, making contact with over 150 investors, of which 56 parties signed confidentiality agreements and were provided marketing materials, while some were provided access to the data room and allowed to conduct further due diligence.  Despite these efforts, as of the Petition Date, no further investors or purchasers were found.

45.     In December of 2014, recognizing the need to restructure their business, the Debtors hired my firm, Capstone, to serve as financial advisors, with the goal of managing the Debtors' deteriorating working capital situation, which was resulting in the Debtors' inability to acquire sufficient inventory to drive sales.  In January of 2015, the Debtors retained Capstone as Chief Financial Officer and in March of 2015, I was retained to serve as Chief Restructuring Officer of the Debtors.

46.     I implemented various strategies in an effort to shore up liquidity, including restructuring the Debtors' workforce, controlling costs, and switching all product lines to a dropship model.  Despite these efforts, the Debtors' liquidity issues intensified.  As the Debtors grew further behind in the payment of invoices to its vendors, too much of the Debtors' efforts were spent trying to manage suppliers and its customer base with what limited cash resources they possessed.  As it became apparent that (a) there would be no "white knight" to purchase the

Debtors' businesses, (b) the Debtors were unable to find additional sources of capital and (c) the Debtors' accounts payables were growing to a level that the Debtors risked imminent shut off by its major suppliers and vendors, talks with the Prepetition Senior Lenders intensified with respect to a restructuring or exit plan.

47.     As the Debtors were days away from having no cash left to pay their day-to-day operations or employees, the Debtors determined in their business judgment that a chapter 11 bankruptcy filing offered the best chance for the Debtors to maximize the value of their businesses and assets for their estates and creditors.  To achieve this goal, as the Debtors' on-going cash collateral would not be sufficient to sustain their operations during a bankruptcy, the Debtors approached the Prepetition Senior Lenders about their providing debtor-in-possession financing to the Debtors, which DIP Lenders have offered to provide on terms similar to those of the Prepetition Senior Facility, subject to the terms of the DIP Credit Agreement and the DIP Facility. Further, the Stalking Horse, which is an affiliate of one or more Prepetition Senior Lenders, has provided the Debtors with the Stalking Horse Bid in the form of, and subject to the terms and conditions of, the Stalking Horse APA and the other Stalking Horse Sale Documents, subject to Court approval.  The Debtors intend to file the Stalking Horse Sale Documents with the Court over the next few days.  The Debtors, upon reviewing the terms of the Stalking Horse APA and bidding procedures, determined that accepting such bid and commencing these Cases was the best means to preserve and maximize the value of the Debtors' assets for all of their estates and creditors.

**F.     The Debtors' Goals In These Cases.**

48.     The Debtors intend to sell all or substantially all of their assets through a section 363 sales process.  Given the Debtors' increasingly eroding liquidity and mounting trade debt,

the Debtors believe that this is the best means to maintain the Karmaloop brand and business model, while maximizing the value of their asset for the benefit of their estates and creditors.

49.     Given that the Debtors' cash collateral will not be sufficient to maintain their operations through the contemplated 60 day sales process, the Debtors intend to enter into the DIP Facility, subject to Court approval.  Pursuant to the DIP Facility, the DIP Lenders will provide a credit line to the Debtors to be drawn down in accordance with the DIP Facility and a post-petition budget (the "Budget") agreed to by Senior Agents, Senior Lenders, and the Debtors, subject to the terms of the DIP Facility.

50.     The Debtors also intend to enter into the Stalking Horse APA and the other Stalking Horse Sale Documents for the purchase of substantially all of the Debtors' assets, subject to the terms and conditions of the Stalking Horse Sale Documents. The Stalking Horse is an affiliate of one or more Prepetition Senior Lenders, has agreed to serve as the stalking horse bidder, and reserves the right to credit bid all or any portion of the obligations owed by the Debtors to the Senior Agents and the Senior Lenders under the Senior Facilities, as applicable, in connection with the Stalking Horse Bid, subject to the terms of the Stalk Horse Sale Documents.

51.     I believe that the financing plan offered by the DIP Lenders and the Stalking Horse Bid provide the Debtors with the best means to preserve and maximize the value of their assets for the benefit of their estates in light of the extreme financial difficulties and hardships affecting the Debtors' business operations.  Without the proposed DIP Facility the Debtors will have insufficient liquidity to operate, and without the Stalking Horse Bid, the Debtors will face enormous difficulties in developing a viable exit strategy.  Further, even with the proposed DIP Facility, the Debtors will not have sufficient liquidity to have a drawn out sale process.  I further believe that the Debtors are unable, in the present circumstances, to meet their liquidity needs by

obtaining financing on an unsecured, administrative expense basis. Without the DIP Facility and the Stalking Horse Bid, the Debtors would be unable to maintain their respective businesses, as their customers, vendors, and suppliers would likely stop doing business with the Debtors in the near term.

52.     Based on my experience and the negotiations that were undertaken, I believe that the DIP Facility and the Stalking Horse Sale Documents are on the best terms and conditions available to the Debtors under the present circumstances. In addition, I believe that the DIP Facility and Stalking Horse Bid provide the Debtors with better value than they could reasonably expect to obtain if the Debtors commenced this case without debtor-in-possession financing or a stalking-horse bid to buy all of the Debtors' assets. If the Debtors had commenced a free-fall bankruptcy, I believe there would be a substantial likelihood that the Debtors would ultimately be forced to liquidate their assets, thereby yielding a significantly reduced amount of value to the estates and its ever increasing list of creditors. Further, the DIP Facility and the Stalking Horse Bid provide the Debtors with time to market the Debtors' assets to see if another purchaser will provide a superior offer to purchase the assets.

53.     After filing their petitions, the Debtors intend to operate their business in the ordinary course. In the various First Day Motions being filed contemporaneously with this Declaration, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct their Cases efficiently and economically.

### III.     FACTS IN SUPPORT OF FIRST DAY MOTIONS[2]

54.     In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First

---

[2]     Capitalized terms used in this Section II and not otherwise defined herein shall have the meaning ascribed to them in the respective motion to which they relate.

Day Motions filed concurrently with this Declaration. A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

55.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

### A.    DIP Motion

56.    On an interim basis, the Debtors are requesting access to approximately $29,066,658.00 out of a total $30,866,658.00 commitment under the DIP Facility. During the interim period before a final order is entered allowing the Debtors to borrow in accordance with the DIP Facility, all of the Debtors' cash collateral will be used to repay outstanding obligations under the Prepetition Senior Facility. After a final order is entered, the DIP Facility will be used to refinance all remaining outstanding obligations under the Prepetition Senior Facility. The DIP Facility will be used to fund fees under the DIP Facility, pay the Debtors' vendors and suppliers and provide working capital in connection with the Debtors' operations, all subject to the terms of the DIP Facility.

57.    The Debtors' liquidity issues amongst other business issues provide a clear basis to support the post-petition borrowings sought by the Debtors. As is explained in greater detail in the DIP Motion, the DIP Facility will be used to provide necessary liquidity for working capital and other general corporate purposes of the Debtors. The funds to be advanced by the DIP Lenders under the DIP Facility are necessary for the Debtors to operate their businesses in the normal course, including funding their payroll operations and other business obligations.

Without the immediate access to the cash to be provided by the DIP Facility, the Debtors would be unable to fund their operations, which would be disastrous to the Debtors' efforts to maintain a viable business until a Sale is consummated. I believe that access to the funds to be provided by the DIP Lenders are absolutely crucial to the Debtors' ability to maintain their businesses and not terminate operations immediately and thereby avoid immediate and irreparable harm to the Debtors' estates, employees, customers and creditors.

58.    With the assistance of the Debtors' management team, I have created a proposed weekly cash flow budget that demonstrates projected cash flow and funding deficiencies. The Debtors, subject to a permitted variance as set forth in the DIP Facility, will be required to comply with the Budget. With respect to postpetition spending and payments, the projections found in the Budget represent the Debtors' best estimate of their near term future performance and liquidity needs, recognizing that the any financial projection is just an estimate of future performance and actual performance may differ. The projections in the Budget are expressly premised on approval of the DIP Facility on an interim and final basis. In my opinion, without the availability to be provided under the DIP Facility, the Debtors would be unable to fund operations, as the financing provides a measure of comfort to the Debtors' vendors, customers and employees such that the Debtors should be able to honor their obligations during the pendency of the Cases.

59.    The Debtors have sought and were unable to obtain financing from other sources on terms preferable to the proposed in the DIP Facility, including, without limitation, on an unsecured or administrative expense basis. Given the troubles facing retailers in the youth apparel market, combined with the Debtors' continued projected losses, the Debtors were unable to find alternative financing on a postpetition basis.

60.     The terms of the DIP Facility, on the one hand, and the Stalking Horse Sale Documents, on the other, and the agreements and documents related thereto, were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders and the Stalking Horse, respectively, resulting in agreements designed to permit the Debtors to maximize the value of their assets. The proposed terms are fair, reasonable and appropriate under the circumstances.

61.     The Debtors' three-member and two-member, respectively, Boards of Directors determined in the exercise of their sound business judgment that the Debtors require financing under the terms of the DIP Facility and the agreements related thereto.

62.     I believe that the relief requested in the DIP Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**B.      Joint Administration Motion.**

63.     The Debtors in these Cases are affiliated entities and their financial affairs and business operations are closely related. KL is the sole shareholder of KLTV. All of the Debtors are under common management and they share many creditors and parties in interest. As a result, joint administration will prevent duplicative efforts and unnecessary expenses.

64.     I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief sought in the Joint Administration Motion is in the best interests of the Debtors' estates.

**C.      Employee Compensation and Benefit Motion.**

65.     The Debtors' workforce is comprised of full-time salaried employees (the "Salaried Employees"), full-time hourly employees (collectively with the Salaried Employees, the "Full Time Employees"), and regular part-time hourly employees ("Part Time Employees").

As of the Petition Date, the Debtors employ approximately 32 hourly Full Time Employees, 3 hourly Part Time Employees, and 56 salaried Full Time Employees, for a total of 88 Full Time Employees, and 3 Part Time Employees. There are currently no Employees on leave. Of the Debtors' current workforce, all Employees are employed by KL and none are employed by KLTV. The majority of the Debtors' Employees are located at the Debtors' corporate headquarters in Boston, Massachusetts. In addition, the Debtors have employees based out of Kentucky, Nevada, Indiana, and New York.

66.     All hourly Employees are paid bi-weekly. Salaried Employees are paid on the 15th and 30th/31st of every calendar month, or the last business day prior to the 15th and 30th/31st of the month when such dates fall on a non-business day.   Hourly Employees are paid every two weeks for the prior two-week period (Monday through a week from the following Sunday).

67.     The Debtors' payroll process for hourly Employees is as follows: on every other Tuesday, or "Submit" day, timesheets for all hourly Employees are run and checked for errors and exceptions using a Time and Labor module ("T and L") provided by the Debtors' third party payroll administrator, Paychex, Inc. ("Paychex"). Once all the entries are corrected, a report is generated in T and L to be uploaded in the Paychex payroll module.   After all recurring and one-time earnings and deductions are entered, a payfile (the "Hourly Payfile") is sent out to Paychex for processing. On Wednesday, the Hourly Payfile is received by Paychex, and funds for direct deposits are withdrawn from the Debtors' bank account. Paychex then issues payment to Employees in the form of both direct deposit and physical check for those Employees not participating in direct deposit ("Hourly Employee Paydays").  All necessary reports are run and a journal entry is prepared using these reports, and funds for tax liabilities are withdrawn from the Debtors' bank account.

68.    Unlike hourly payroll, payrolls for salaried Employees are run 24 times a year on semi-monthly basis – the 15th and 30th/31st of every month, or the last business day prior to the 15th and 30th/31st of the month when such dates fall on a non-business day ("Salary Payroll Dates"). One day before each Salary Payroll Date, a payfile (the "Salary Payfile") is created identifying all recurring and one-time earnings, deductions, and adjustments. A preview report is then run, which shows all Employees' net wages after withholding tax obligations. The preview report is saved and a list of Employees with net pay amounts is generated and recorded in a spreadsheet (the "Spreadsheet"). Live checks (the "Paychecks") are then printed in Quickbooks based on the Spreadsheet, and individual check numbers are then added to the Spreadsheet. Once all of the Paychecks are printed, they are modified to have "Manual Check" as payees for confidentiality purposes and distributed to the Employees on the last business day of the payroll cycle (the "Salaried Employee Paydays"). Following distribution of the Paychecks, the Salary Payfile is transmitted to Paychex before the next Salaried Employee Payday so that Employees' year-to-date information reflects what has been earned and withheld, which are the basis for tax calculations on the next Paychecks. Following distribution of the Paychecks, funds for tax liabilities are withdrawn from the Debtors' bank account and all  necessary reports are run and a journal entry is prepared using these reports.

69.    In 2014, the average monthly amount paid to all Employees was approximately $534,792.81, which amount includes wages for salaried and hourly Employees. The Debtors' most recent prepetition Salaried Employee Payday was March 13, 2015, and their most recent prepetition Hourly Employee Payday was March 19, 2015. The total, aggregate amount of the most recent payroll cycles for both hourly and salaried Employees was approximately $260,000. The Debtors' next scheduled Salaried Employee Payday is March 31, 2015, and the next

scheduled Hourly Employee Payday is April 2, 2015. The Debtors expect that payroll expenses going forward will be lower than historical amounts because of the reduction in size of the Debtors' workforce in the months leading up to the filing of these Cases.

70.     The Debtors believe that, as of the Petition Date, approximately $110,000 was earned but remains unpaid with respect to Salaried Employees on account of accrued prepetition wages and salaries. In addition, the Debtors believe that, as of the Petition Date, approximately $25,000 was earned but remains unpaid with respect to Hourly Employees on account of accrued prepetition wages and salaries. The amount owed to any individual Employee on account of prepetition Employee Claims does not exceed $8,000 and is not in respect of any time period more than seven days before the Petition Date.

71.     In addition, the Debtors contract with approximately 10 additional workers, who are independent contractors. These approximately 10 individuals are compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $500 per week. These workers are owed approximately $500 in respect of prepetition services.

72.     In order to ensure optimal performance by the Employees, the Debtors offer bonus and incentive programs (collectively, the "Employee Bonus Programs") to certain Employees. Bonuses are based on individual Employee performance and reaching certain metrics. In addition, Employees are awarded bonuses if, because of their efforts, particular brands of merchandise sold through the Debtors' website hit certain sales metrics. The Debtors do not maintain a formal Employee Bonus Program and bonuses paid out to Employees are determined on a case by case basis. As of the Petition Date, the Debtors do not owe any money in prepetition bonuses to Employees.

73.    *Paid Time Off.*  The Debtors' Employees accrue vacation time ("Vacation") and sick leave ("Sick Leave") as follows:  Full Time Employees are eligible for paid Vacation and Sick Leave. They are eligible to accrue Vacation for each calendar month of service following completion of their 3 month introductory period with the Debtors (the "Introductory Period")

- Full Time Salaried Employees – based on 24 paychecks:

| Length of Employment | Accrual Rate per Check | Total Accrual Per Full Year (in hours) |
|---|---|---|
| 3 months to 2 years | 3.34 | 80 Hours |
| 2 years to 5 years | 5 | 120 Hours |
| 5 years + | 6.67 | 160 Hours |

- Full Time Hourly Employees – based on 26 paychecks:

| Length of Employment | Accrual Rate per Check | Total Accrual Per Full Year (in hours) |
|---|---|---|
| 3 months to 2 years | 3.08 | 80 Hours |
| 2 years to 5 years | 4.62 | 120 Hours |
| 5 years + | 6.16 | 160 Hours |

If the Introductory Period completion date is within the first through the fifteenth of the month, the Employees will accrue Vacation for that full month. If the Introductory Period completion date is within the sixteenth through the end of the month, the Employees will start to accrue Vacation on the first day of the following month.  Paid time off ("PTO") is paid at the Employee's base pay rate at the time of Vacation and does not include overtime or any special forms of compensation such as incentives or commissions.  Although PTO is accrued on a per pay basis, an Employee may borrow up to 24 hours-worth of PTO. However, should one terminate employment, any used but unearned Vacation will be deducted from their final paycheck.  Any employee terminating employment will be entitled only to Vacation that has been accrued but not taken. If the termination date is earlier than the sixteenth day of a month, no

26

vacation will be earned for that month. If an Employee is on an approved leave of absence for less than thirty days, their PTO eligibility will not be affected. If the leave of absence extends beyond thirty days, PTO time will not continue to accrue. PTO is capped at the total accrual max based on the length of employment. PTO cannot be carried over from one year to the next nor is PTO granted in lieu of taking the actual time off. PTO also includes any Sick Leave, which includes: an Employee's personal illness, well-care, medical and dental appointments, and other personal appointment. Sick Leave may also be used for illness and well-care in an Employee's immediate family. PTO for sick leave is earned and calculated in the same manner set forth Vacation.

74. As of the Petition Date, the Employees had approximately $70,000 in the aggregate of accrued and unused Vacation and Sick Leave. No Employee is owed more than $12,475 in the aggregate for wages, salaries, and accrued but unused Vacation.

75. *Severance*. The Debtors do not maintain a formal severance pay policy. However, in their discretion, the Debtors do, on occasion, provide severance packages to certain Employees. Typically, Employees that leave the employ of the Debtors' will receive some form of severance package, but each such package is determined on a case by case basis. As of the Petition Date, the Debtors do not owe any money in severance benefits to Employees.

76. Prior to the Petition Date, the Debtors offered their Full Time Employees various standard employee benefits (the "Benefit Programs") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) vision insurance, (d) COBRA coverage, (e) flexible spending accounts, and (f) life and disability insurance. The amounts set forth below reflect the approximate prepetition cost of such Benefit Programs, which the Debtors seek to continue in the ordinary course of their business.

77.    *Medical Insurance Program.* Full Time Employees are eligible to participate in the Debtors' medical insurance program administered through Harvard Pilgrim (the "Health Plan"). Employees become eligible for enrollment in the Health Plan on the first day of the next calendar month following their date of hire. The Health Program includes benefits typical of such plans provided by similar companies. The Health Plan is approximately 65% paid by the Debtors and 35% paid by the Debtors' Full Time Employees through paycheck withholding. The average monthly cost to the Debtors, after taking into account Employee contributions, of maintaining the Health Plan has been approximately $40,000 per month. The Debtors are unable to estimate with specificity the total prepetition amounts owing in respect of the Health Plan, because the lag time on Employees' submissions of medical claims varies. However, based on historical data, and based on prepetition claims reported but not yet paid, the Debtors believe that they owe, in the aggregate, approximately $60,000 as of the Petition Date for prepetition costs incurred under the Health Plan.

78.    *Dental Insurance Program.* Full Time Employees are eligible to participate in the Debtors' dental program administered through Cigna (the "Dental Plan"). Employees become eligible for enrollment in the Dental Plan on the first day of the next calendar month following their date of hire. The Dental Plan includes benefits typical of such plans provided by similar companies. The Dental Plan is paid entirely by the Debtors' Full Time Employees through paycheck withholding, however, it is the Debtors' responsibility to transmit those amounts directly to Cigna. The average monthly amount remitted to Cigna from Employee wages withheld is approximately $3,000 per month. The Debtors estimate that as of the Petition Date they owe approximately $6,000 in respect of remittances due to Cigna under the Dental Plan.

79.     *Vision Insurance Program.* Full Time Employees are eligible to participate in the Debtors' vision program administered through EyeMed (the "Vision Plan"). Employees become eligible for enrollment in the Vision Plan on the first day of the next calendar month following their date of hire. The Vision Plan includes benefits typical of such plans provided by similar companies. The Vision Plan is paid entirely by the Debtors' Full Time Employees through paycheck withholding, however, it is the Debtors' responsibility to transmit those amounts directly to EyeMed. The average monthly amount remitted to EyeMed from Employee wages withheld is approximately $400 per month. The Debtors estimate that as of the Petition Date they owe approximately $500 in respect of remittances due to EyeMed under the Vision Plan.

80.     *Life, Disability and Related Insurance Coverage.* Full Time Employees are eligible to participate in the Debtors' Life, Short Term Disability and Long Term Disability program administered through The Standard (the "Related Insurance Programs"). Employees become eligible for enrollment in the Related Insurance Programs on the first day of the next calendar month following their date of hire. The Related Insurance Programs include benefits typical of such plans provided by similar companies. The Related Insurance Plans are paid entirely by the Debtors. In the aggregate, the average monthly cost of maintaining the Related Insurance Plans has been approximately $1,400. The Debtors estimate that as of the Petition Date they owe approximately $5,000 in respect of the Related Insurance Plans.

81.     *COBRA.* The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. Paychex is the third-party COBRA administrator for the Debtors. The Debtors have historically paid approximately $1,000 per month for administration of their COBRA obligations, which amounts

are included in costs paid by the Debtors under the aforementioned benefit programs. That is to say, the Debtors do not owe any additional amounts as of the Petition Date in respect of COBRA obligations beyond those set forth above. That said, in case additional prepetition amounts are fond to be due and owing, the it would be prudent and appropriate for the Debtors to allocate $2,500 to pay prepetition COBRA expenses of which the Debtors are not currently aware.

82.    *Flexible Spending Accounts.* The Debtors offer their Full Time Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan. The flexible spending benefits (the "Flex Benefits") are administered by Paychex, and there is no additional cost to the Debtors for such administration, which is included as part of the packaged service provided to the Debtors by Paychex.  The Debtors estimate that as of the Petition Date they owe approximately $5,000 in respect of these benefits.

83.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors. The Debtors maintain a workers' compensation benefits program through The Hartford (the "WC Program"), which WC Program is administered by Paychex. The WC Program provides benefits to all of the Debtors' Employees for claims arising from or related to the Employee's employment with the Debtors. During the past two years, the average monthly cost to the Debtors of honoring claims under the WC Program has historically been approximately $2,000, although the exact figure for any given month varies on a case-by-case basis. It is therefore difficult to estimate with precision the value of prepetition obligations in respect of the WC Program.

84.    The Debtors maintain a 401(k) plan (the "Retirement Plan"), administered by John Hancock, through which qualified and participating Employees may defer a portion of their

30

salary to help meet their financial goals and accumulate savings for their future. The Retirement Plan is funded solely by Employee contributions. The Debtors pay approximately $15,000 each year for audit, administration and related expenses concerning the Retirement Plan.

85.    Prior to the Petition Date, the Debtors directly or indirectly reimbursed their Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment. ("Employee Expenses"). The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, automobile mileage and other business-related expenses, as well as reimbursement for cellular telephone expenses. Employees with business-related expenses submit a form with receipts in order to obtain reimbursement. If reimbursements are in excess of $500, the Employees must obtain approval from their direct manager, the CEO or COO. Reimbursement payments are made by the Debtors as part of the normal payroll cycle and are included in the Paychecks or by separate live check for those Employees paid through direct deposit. Historically, approximately $6,000 has been paid on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time a reimbursement request is submitted by the Employee, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses. However, the Debtors estimate that, as of the Petition Date, approximately $6,000 in Employee Expenses remain unpaid.

86.    The Debtors routinely deduct certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs and other similar programs. On a monthly basis,

the Debtors have deducted approximately $80,000 in the aggregate from Employees' pay. Approximately $25,000 of Employee deductions have accrued prepetition but have not yet been funded to various third parties. In addition, the Debtors are responsible for remitting, for their own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). The Debtors have paid approximately $50,000 in the aggregate for employer-obligated Payroll Taxes each month, and the Debtors believe that approximately $15,000 is owing in that respect as of the Petition Date.

87.    As discussed above, the Debtors utilize Paychex as their payroll administrator, as well as the administration of Flex Benefits and the WC Program . The Debtors pay Paychex approximately $3,000 per month for its administrative services.  As of the Petition Date, approximately $1,500 is owing to Paychex.

88.    As discussed above, the Debtors utilize Cigna, EyeMed, and The Standard as administrators of the Debtors' Dental Plan, Vision Plan, and Related Insurance Plans, respectively.  The Debtors pay approximately $7,000 per month, in the aggregate, in connection with each of these plans.  As of the Petition Date, approximately $10,000 is owing to Cigna, EyeMed, and The Standard, collectively.

89.    As discussed above, the Debtors utilize The Hartford in connection with the WC Program. The Debtors pay The Hartford approximately $250 per month in connection with the WC Program. As of the Petition Date, approximately $250 is owing to The Hartford.

90.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  I believe that without the relief

32

requested in the Employee Compensation and Benefits Motion being granted, there is a great risk

that the Employees required going forward for the Debtors' success will seek alternative

employment opportunities. Such a development would deplete the Debtors' workforce, thereby

hindering the Debtors' ability to successfully conduct these Cases.

### D.      Cash Management Motion.

91.      Prior to the commencement of these chapter 11 cases, in the ordinary course of

their business, the Debtors maintained three (3) accounts out of which they manage cash receipts

and disbursements (the "Bank Accounts"). The Bank Account ending in 1883 is the Debtors

primary transactional account and will continue to be used for ordinary course payments to

postpetition creditors and vendors, and is subject to a control agreement in favor of Senior

Agents.

92.      A second Bank Account ending in 1736 shall be used in accordance with the DIP

Credit Agreement for the purpose of receiving all collateral proceeds postpetition, in accordance

with the terms of the proposed DIP Credit Agreement, and is subject to a control agreement in

favor of Senior Agents. Proceeds deposited into this Bank Account will be used by the Debtors

pursuant to, and in accordance with, the DIP Credit Agreement and the other Loan Documents

(as defined in the DIP Credit Agreement).

93.      A third Bank Account ending in 9734 is used as a segregated account for the

collection and transmission of state sales and use taxes (the "Taxes"). On average, the Taxes

assessed by the various state taxing authorities total approximately 2% - 2.5% of sales; therefore,

the Debtors transmit 2.5% of their sales receipts into this segregated account on a daily basis.

94.      The Debtors' cash management systems are highly automated and computerized.

This allows the Debtors to manage centrally all of their cash flow needs and includes the

necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace

funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

95.    The cash management procedures that the Debtors use constitute ordinary, usual and essential business practices and are similar to those used by other major e-commerce enterprises. The cash management systems benefit the Debtors in significant ways, including the ability to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

96.    Although not strictly part of its cash management systems, the Debtors are a party to certain agreements with credit card companies, PayPal, Amazon, eBay, and potentially other processors (collectively, the "Credit Card Companies"), under which the Debtors are able to accept credit card payments, subject to certain adjustments, returns, promotional fees and refunds. As an e-commerce business, effectively all of the Debtors' sales are purchased through the Credit Card Companies and the Debtors' continued ability to honor and process credit card transactions is essential to the Debtors' reorganization efforts. Under the terms of its agreements with the Credit Card Companies, the Debtors are required to pay the Credit Card Companies fees for their services, certain amounts of which may have accrued but remain unpaid as of the Petition Date.

97.    The operation of the Debtors' business requires that the cash management systems continue during the pendency of these chapter 11 cases. Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be expensive, would create unnecessary administrative problems and would likely be much more

disruptive than productive. Any such disruption could have an adverse impact upon the Debtors' ability to reorganize. Consequently, maintenance of the existing cash management systems, as they may be modified under the proposed postpetition financing, during these chapter 11 cases is in the best interests of all creditors and other parties in interest.

98.     In light of the substantial size and complexity of the Debtors' operations, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**E.     Tax Motion.**

99.     In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use and various other taxes, fees, charges, and assessments (the "Taxes and Fees"). The Debtors remit such Taxes and Fees to various federal, state and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the sale and shipping of products via the Debtors' ecommerce platforms. The Taxes and Fees are paid monthly, quarterly, semi-annually or annually to the respective Taxing Authorities, depending on the given Tax or Free and the relevant Taxing Authority to which it is paid. As of the Petition Date, the Debtors estimate that they owe approximately $94,000 in unremitted Taxes and Fees representing sales and use taxes that have been collected prior to the Petition Date by the Debtors in the ordinary course of its business for sales consummated in the first quarter of 2015, but have not yet been remitted. The Debtors are seeking the authority, but not the obligation to pay such unremitted Taxes and Fees.

100.     Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the

Debtors' operations as a whole, as described in the Taxes Motion. Further, a large component relates to sales taxes that the Debtors have collected from their customers but have not remitted to the applicable Taxing Authorities. I believe that the payment of the Taxes and Fees is in the best interest of the Debtors and their estates, will not harm unsecured creditors and may reduce harm and administrative expense to the Debtors' estates.

**F.    Utilities Motion.**

101.    In connection with the operation of their business, the Debtors obtain electricity, telephone, internet, waste disposal, and other similar services (collectively, the "Utility Services") from several utility companies or brokers (collectively, the "Utility Companies").

102.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases. The Debtors' operations and corporate office require electricity, telephone, internet, waste disposal, in addition to other Utility Services. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted. Accordingly, it is essential that the Utility Services continue uninterrupted during these Cases.

103.    On average, the Debtors pay approximately $15,105 each month for third party Utility Services.

104.    For the reasons already set forth herein and the Utilities Motion, the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption and to preserve value for the Debtors' estates.

**G.    Insurance Motion.**

105.    In connection with the operation of their business and management of their affairs, the Debtors maintain various Insurance Policies. The Insurance Policies include, but are

36

not limited to, coverage for Crime, Directors and Officers Liability, Employment Practices

Liability, Workers Compensation, and General Liability. The third-party claims that are covered

by the Insurance Policies are neither unusual in amount, nor in number, in relation to the extent

of the business operations conducted by the Debtors.

106.    Maintenance of insurance coverage under the various Insurance Policies is

essential to the continued operation of the Debtors' business and is required under the laws of the

various states in which the Debtors operate. The Debtors believe that approximately $22,000 in

outstanding premium payments will be due postpetition in connection with the Insurance

Policies.

107.    The Debtors have been represented in their negotiations with their various

insurance underwriters by Lockton Companies, Inc. ("Lockton"). The employment of Lockton

as the Debtors' insurance broker has allowed the Debtors to obtain the insurance coverage

necessary to operate their business in a reasonable and prudent manner and to realize

considerable savings in the procurement of such policies. The Debtors believe that it is in the

best interests of their creditors and estates to continue their business relationship with Lockton.

108.    The coverage provided under the Insurance Policies is essential for preserving the

value of the Debtors' assets and, as stated above, in many instances such coverage is required by

various regulations, laws and contracts that govern the Debtors' business operations. Moreover,

I understand that maintenance of insurance policies is required by the operating guidelines

established by the Office of the United States Trustee. If the Debtors fail to perform their

obligations under the Insurance Policies, their coverage thereunder could be adversely impacted

or even voided. The Debtors may also need to renew or replace certain of the Insurance Policies

during the course of these chapter 11 Cases, or enter into new insurance policies. If the Debtors

do not pay the prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

109.     For the reasons already set forth herein and in the Insurance Motion, the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption and to preserve value for the Debtors' estates and their creditors.

**H.     Claims Agent Application.**

110.     Prior to the selection of RustOmni ("Omni") as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at least three claims and noticing agents to ensure selection through a competitive process.  I believe, based on all the engagement proposals obtained and reviewed, that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.

111.     In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of Omni as claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

Executed this 23rd day of March 2015 at Boston, Massachusetts

Karmaloop, Inc.
KarmaloopTV, Inc.
Debtors and Debtors in Possession

By: /s/ Brian Davies
Brian L. Davies, Jr.
Chief Restructuring Officer

38