## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No.  15-10635 (___) |
| KARMALOOP, INC., et al., | |
| | |
| Debtors. [1] | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING

Karmaloop, Inc. and its subsidiary, the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of an interim order (the "Interim DIP Order") substantially in the form attached hereto as Exhibit A, and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final DIP Order" and, with the Interim DIP Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to obtain secured post-petition superpriority financing (the "DIP Facility") from

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Karmaloop, Inc. - 3934 and KarmaloopTV, Inc. - 8230.  The Debtors' address is 334 Boylston Street, Suite 500, Boston, MA 02116.

its existing prepetition senior secured lenders, and use cash collateral on an interim and final basis pursuant to the terms and conditions of (i) that certain Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") (attached hereto as Exhibit B) by and among Karmaloop, Inc., the lender parties identified therein (the "DIP Lenders"), and Comvest Capital II, L.P. as agent for the DIP Lenders (the "DIP Agent"), and (ii) that certain Debtor-in-Possession Collateral Agreement (the "DIP Security Agreement") (attached hereto as Exhibit C), by and among the Debtors, any subsidiary of the Debtors that becomes a Loan Party under the DIP Security Agreement, the DIP Lenders, and the DIP Agent.  In support of the Motion, the Debtors rely on and incorporate by reference the Declaration of Brian L. Davies, Jr., filed in support of the Debtors' chapter 11 petitions and various first day applications and motions (the "Declaration"), filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned proposed attorneys, respectfully represent as follows:

## I.    Jurisdiction, Venue and Authority

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363 and 364, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## II.    Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Cases for procedural purposes only.

6.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No requests have been made for the appointment of a trustee or an examiner in these Cases, and no official committee has yet to be appointed by the Office of the United States Trustee.

7.      The Debtors operate as a cross-platform digital commerce and media property company that specializes in the sale of global Streetware fashion and culture. The Debtors specialize in the sale of over 400 brands of apparel, shoes and accessories for men and women that are marketed to a specialized group of male and female customers ages 18-30.  The Debtors operate their businesses entirely via an e-commerce business model, using the web site www.karmaloop.com and have nearly 5 million monthly unique visitors, 2.2 million Facebook followers and 800,000 Twitter followers.

8.      Prior to the extension of credit by the Debtors' senior secured lenders, the Debtors' operational financing was provided through two levels of junior secured debt, all of which have now been subordinated to the Debtors' senior secured lenders.  One level of junior secured debt is held by Eastward Capital Partners V, L.P. ("Eastward").

The other level of junior secured debt is held by several other secured lenders (collectively, the "Prepetition Junior Secured Creditors"), and Greg Selkoe serves as agent on behalf of the Prepetition Junior Secured Creditors. The two levels of junior secured debt are *pari-passu*.

9.     In August 2012, the Debtors established a prepetition senior secured credit facility under a Credit Agreement (the "Original Senior Secured Credit Agreement") by and among Karmaloop, Inc. ("Karmaloop"), as borrower, KarmaloopTV, Inc. ("KarmaloopTV"), as a guarantor, and Comvest Capital II, L.P. ("Comvest"), as a lender. The Original Senior Secured Credit Agreement was amended and restated in June 2014 pursuant to an Amended and Restated Credit Agreement (the "Prepetition Senior Credit Agreement") by and among Karmaloop, as borrower, KarmaloopTV, as a guarantor, Comvest and CapX Fund IV, L.P. ("CapX"), as lenders (collectively the "Prepetition Senior Secured Lenders"), and  Comvest, as agent for the Prepetition Senior Secured Lenders ("Prepetition Agent"). Both Eastward and the Junior Secured Creditors have executed subordination agreements in favor of the Prepetition Senior Secured Lenders and Prepetition Agent and, as a result, the obligations and security interest granted under the Prepetition Senior Credit Agreement are senior to the obligations owed to Eastward and the Junior Secured Creditors and their respective security interests.

10.     The Debtors' businesses have fallen victim to the shift in retail purchasing that is occurring, especially among retailers in the young adult age bracket, as such consumers have moved away from purchasing traditional brands. In addition to this industry-wide trend, the Debtors' financial performance was also adversely impacted by, *inter alia*, a) a lack of capital to purchase sufficient inventory to meet demand; b) an

inability to fully adapt to business strategies that result in better margin opportunities such as fast fashion private label and print-when-ordering manufacturing and c) over-ambitious expansion efforts.

11.     As a result of this downturn, the Debtors' liquidity position became further constrained in late 2014, when many of the Debtors' creditors and vendors began to require cash on delivery payment terms in order to ship goods, rather than the credit terms that those vendors had offered in the past.

12.     In December of 2014, the Debtors hired CRS Capstone Partners LLC "Capstone") as a financial advisor in hopes of effectuating a restructure of the business by seeking to change previous operations and lines that no longer proved profitable or as profitable as other business strategies available to the Debtors.

13.     There was, unfortunately, insufficient time to implement necessary strategic restructuring before the Debtors faced a liquidity crisis, resulting from operating losses driven by persistent sales weakness.  Today's filing is the result of those pressures, and the Debtors have decided that, in the exercise of their reasonable business judgment, the best means to maximize the value of the Debtors' brand and business is to file for Chapter 11 relief and to seek to sell the Debtors' businesses through a Section 363 sales process.

14.     The Debtors now face a critical need for postpetition financing to allow their revenue generating operations to continue, such that they can preserve value for their creditors and thereby allow the "Karmaloop" brand to survive, as well as save the jobs of many of the Debtors' existing employees.  In order to survive, however, the

Debtors need to maintain liquidity through the 363 sale process, and would rely on the requested DIP Facility for this purpose.

15.     To meet their objectives, the Debtors have entered, subject to this Court's approval, into the DIP Facility, pursuant to which the Debtors will receive a senior secured debtor-in-possession line of credit that should provide them with sufficient liquidity to navigate through the proposed sale process.

16.     The detailed factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the Declaration, filed concurrently herewith and fully incorporated herein by reference.

### III.     Relief Requested

17.     By this Motion, pursuant to Bankruptcy Code sections 105, 361, 363, and 364 and Bankruptcy Rules 4001(b) and (c), the Debtors request that this Court enter interim and final orders authorizing the Debtors to incur postpetition debt and grant adequate protection and security to the DIP Lenders, DIP Agent, Prepetition Secured Lenders and Prepetition Agent.

18.     The Debtors seek authority to borrow up to $30,866,658 under the DIP Facility.  The DIP Facility will mature 90 days following the entry of the Interim DIP Order, absent intervening occurrences in the Cases or under terms of the DIP Credit Agreement.  As security for the DIP Facility, the Debtors propose to grant to the DIP Agent, as agent for the DIP Lenders, a first-priority lien on all its assets (the "Liens") with priority over all other liens and security interests in all of the Debtor's assets, subject only to a carve out (the "Carveout") for the Debtors' professionals as well as for accrued

but unpaid fees of the United States Trustee pursuant to 28 U.S.C. § 1930. The Debtors also propose to grant the DIP Agent, as agent for the DIP Lenders, a super-priority administrative claim, subject to the Carveout, as further security for the repayment of the advances to be made under the DIP Facility.

19.    The Debtors seek authorization on an interim basis to borrow up to $29,066,658.00 under the DIP Credit Agreement for the purposes set forth in the Budget and to remit Cash Collateral for repayment of amounts outstanding under the Prepetition Senior Credit Agreement pending the Final Hearing.

20.    Although to the extent Eastward and the Junior Secured Creditors presently hold valid and perfected subordinate liens, and they would retain such liens, immediately prior to and immediately following the Petition Date, the Debtors believe that that both Eastward and the Junior Secured Creditors are fully undersecured and, as such, are not entitled to receive adequate protection at this time with respect to such junior liens.

## IV.    Bankruptcy Rule 4001 Concise Statement

21.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-1, below is a summary of the terms of the Loan Agreement:[2]

| (a) | Borrower: | Karmaloop, Inc. |
|---|---|---|
| (b) | Guarantors: | • KaramloopTV, Inc.<br>• All other subsidiaries of the Borrower<br>• Gregory Selkoe (pursuant to the Selkoe Limited Personal Guaranty Agreement) |
| (c) | DIP Lender: | • Comvest Capital II, L.P. (Lender and Agent for Lenders)<br>• CapX Fund IV, L.P. (Lender) |
| (d) | Purpose: | (a) to fund general corporate purposes relating to the Borrower's post-petition operations, subject to the Budget, (b) to pay chapter 11 expenses, including allowed professional fees subject to the terms and conditions contained in the Term Sheet among the Debtors and the DIP Lenders, and (c) to pay all fees and expenses due to DIP Agent and DIP Lenders under the DIP Facility (including, without limitation, all professional fees and expenses (including legal, financial advisory, appraisal and valuation-related fees and expenses)), including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility (whether incurred before or after the date of the commencement of the chapter 11 cases).<br><br>Upon entry of the Final DIP Order, to repay the outstanding Existing Obligations.<br><br>*(See the 'Use of DIP Proceeds' Section of the DIP Term Sheet)* |
| (e) | Type and Amount of DIP Facility: | • Principal commitments of up to $30,866,658 *(See Section 2.01 of the DIP Credit and definition of "Revolving Loan Commitment")* |

---

[2]    The summary of the terms and conditions of the DIP Credit Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP Credit Agreement and DIP Orders.  In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects.  Capitalized terms used in the following chart, but not defined therein have the meanings ascribed such terms in the DIP Credit Agreement and the Interim DIP Order, as applicable.

| | | |
|---|---|---|
| (f) | Interest Rate: | 12% per annum<br>*(See Section 2.02(a) of the DIP Credit Agreement)* |
| (g) | Facility Fees: | • Closing Fee – $150,000, of which 2/3 will be earned upon entry of the Interim DIP Order and 1/3 of which will be earned upon entry of the Final DIP Order. *(See Section 2.02(b)(i) of the DIP Credit Agreement)*<br>• Unused Line Fee – a fee equal to 50 BPS per annum times the unused portion of the DIP Facility would be due and payable monthly in arrears. *(See Section 2.02(b)(ii) of the DIP Credit Agreement)*<br>• Termination Fee – $60,000 will be payable to the DIP Lenders if the DIP Facility is repaid with proceeds from any other credit facility or repaid other than in connection with a sale of the Debtors' assets to either the stalking horse or to a competing bidder, as contemplated by the Debtors and the DIP Lenders *(See Section 2.02(b)(iii) of the DIP Credit Agreement)* |
| (h) | Payment of Professional Fees: | • All costs and expenses of DIP Agent's and DIP Lenders' professional fees incurred in connection with the Cases and the DIP Facility are to be reimbursed promptly by Borrower (whether or not included within the Budget). *(See Section 9.02(b) of the DIP Credit Agreement)*<br>• All costs and expenses of the Debtors' professionals fees incurred in connection with the Cases and the DIP Facility are to be reimbursed promptly by Borrower pursuant to the Budget and the Interim Compensation procedures established in this case. *(See Section 6.19 and 9.02(b) of the DIP Credit Agreement)* |
| (i) | Closing Date: | Upon entry of the Interim Order<br><br>*(See Section 4.01 of the DIP Credit Agreement and Conditions Precedent identified below)* |
| (j) | Conditions Precedent to Interim Lending: | (a)   All fees, costs and expenses (including fees, costs and expenses of Lenders' counsel, including local Delaware counsel) required to be paid to the DIP Agent and the DIP Lenders on or before the closing date shall have been paid (which condition may be satisfied with the proceeds of the initial advance under the DIP Facility on the closing date);<br><br>(b)   All documentation relating to the DIP Facility |

shall be in form and substance satisfactory to the DIP Agent;

(c)    DIP Agent shall have received the Budget;

(d)    Debtors shall have received Court approval for appointment of Brian Davies as Chief Restructuring Officer, pursuant to an engagement agreement acceptable to the DIP Agent (including, without limitation, with respect to scope of duties, decision-making authority, and compensation);

(e)    All first day and related orders entered by the Bankruptcy Court in the Cases shall be in form and substance satisfactory to the DIP Agent;

(f)    All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility shall be in form and substance satisfactory to the DIP Agent;

(g)    Not later than five (5) business days following commencement of the Cases, entry of an Interim DIP Order satisfactory to the DIP Agent, and not later than 30 days after the entry of the Interim DIP Order, entry of a Final DIP Order in form and substance satisfactory to the DIP Agent, on an application or motion by the Debtors in form and substance satisfactory to the DIP Agent, which Interim DIP Order and Final DIP Order will have been entered on such prior notice to such parties as may be satisfactory to the DIP Agent, approving the transactions and fees outlined herein and granting the priority liens and administrative expense claims described herein;

(h)    The DIP Agent will be satisfied that all obligations of the Debtors with respect to the DIP Facility are secured by valid, enforceable and non-avoidable first priority liens and security interests (other than liens permitted under the DIP Facility); and

(i)    Reaffirmation/modification of the Existing Subordinated Debt Subordination Agreements in favor of the Existing Agent, if requested by Existing Agent or DIP Agent, in each case, in form and substance satisfactory to the DIP Agent,

<table>
<tr><td></td><td></td><td>

including, without limitation, consent from Eastward Capital Partners V., L.P. to the DIP Facility.

(j)    Reaffirmation of the Selkoe Limited Personal Guaranty Agreement.

*(See Section 4.01 of the DIP Credit Agreement)*
</td></tr>
<tr><td>(k)</td><td>Borrowing Limit on Interim Basis:</td><td>

- Interim Limits - The aggregate amount of disbursements set forth in the Budget as of such time; provided, <u>further</u>, however, that the Borrower shall only be permitted to request that the DIP Lenders make Revolving DIP Loans to the extent required to pay, when due, those expenses enumerated in the Budget. *(See Section 2.01(a) of the DIP Credit Agreement)*
- Aggregate Limit - $30,866,658 (the Revolving Loan Commitment), plus the amount of all interest, fees, costs, and other charges that accrue on or after the Filing Date with respect to the DIP Facilities or the Existing Obligations, less any amounts established by the DIP Agent for required reserves. *(See Section 1.01 "Revolving Loan Limit" definition in the DIP Credit Agreement)*
- Minimum Borrowing - Each request for borrowing shall be in the minimum amount of $50,000. *(See Section 2.01(a) of the DIP Credit Agreement)*
</td></tr>
<tr><td>(l)</td><td>Budget and Financial Reporting:</td><td>

The ten (10) week consolidated weekly operating budget of the Debtors setting forth the Projected Information for the periods described therein Attached hereto as <u>Exhibit D</u>.

*(See Section 1.01 "Budget" definition in the DIP Credit Agreement)*
</td></tr>
<tr><td>(m)</td><td>Cash Dominion:</td><td>

Each Debtor and its affiliates to be subject to an executed and delivered control agreement in form and substance reasonably acceptable to the DIP Agent, providing, among other things, for (a) the DIP Agent to have Control over each such Deposit Account or Securities Account, as applicable (collectively, the "<u>Blocked Accounts</u>"), (b) the depositary bank or Securities Intermediary, as applicable, to follow the exclusive directions of the DIP Agent upon notice from the DIP Agent delivered during the continuance of an Event of Default with respect to such Blocked
</td></tr>
</table>

|     |     | Accounts, without the need for any notice to or consent from any Loan Party.<br><br>*(See Section 4.6(a) of the DIP Security Agreement)* |
| --- | --- | --- |
| (n) | Prepayments: | The Borrower shall be required to prepay the unpaid principal balance of the Revolving Loans on the date of (a) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with an aggregate fair value immediately prior to such event equal to or greater than $50,000 in any Fiscal Year; (b)      the issuance by any Loan Party to any Person (other than to another Loan Party) of any shares of stock or other equity interests after the Closing Date, or the receipt by any of any Loan Party of any capital contribution from any Person (other than from another Loan Party) after the Closing Date; (c) the incurrence by any Loan Party of any Indebtedness not permitted by this Agreement; and (d) the receipt by any Loan Party of any Extraordinary Receipts in excess of $50,000 in the aggregate in any Fiscal Year (and on any date thereafter on which proceeds pertaining thereto are received by any Loan Party), in each case without any demand or notice from the Lender or any other Person, all of which is hereby expressly waived by the Borrower, in the amount of one hundred percent (100%) of the proceeds (net of documented reasonable out-of-pocket costs and expenses incurred in connection with the collection of such proceeds, in each case payable to Persons that are not Affiliates) received by any Loan Party with respect to such Prepayment Event.  *See Section 2.01(d)(iii) and Section 1.01 "Prepayment Event" definition in the DIP Credit Agreement)*<br><br>See also Termination Fee above, which is applicable to these required prepayments.  *(See Section 2.02(b)(iii) of the DIP Credit Agreement)* |
| (o) | Maturity Date: | 90 days from the entry of the Interim DIP Order<br><br>*(See Section 1.01 "Termination Date" and "Commitment Expiry Date" definitions in the DIP Credit Agreement)* |
| (p) | Lien and Superpriority Claim; Priority: | All obligations of the Debtors in respect of the DIP Facility shall be (i) entitled to super-priority administrative expense claim status pursuant to |

- 12 -

| | | |
|---|---|---|
| | | § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carveout; and (ii) secured, pursuant to §§ 364(c)(2) and (c)(3) and § 364(d) of the Bankruptcy Code by a security interest and lien on the DIP Collateral, subject to the Carveout. *(See 'Security/Priority' Section of the DIP Term Sheet and Section 3.25 of the DIP Credit Agreement)* |
| (q) | Collateral: | Subject to the Carveout, all DIP Obligations to the DIP Lenders, shall be secured by the "DIP Collateral," which shall include all assets (including, upon entry of the Final DIP Order, proceeds of Chapter 5 avoidance actions) (whether tangible, intangible, real, personal or mixed) of Debtors, whether now owned or hereafter acquired and wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, all products and proceeds thereof, and a pledge by Borrower of 100% of its equity interest in its direct Subsidiaries. *(See 'Security/Priority' Section of the DIP Term Sheet and Section 1.01 "Collateral" definition in the DIP Credit Agreement)* |
| (r) | Waivers: | Borrower (on behalf of each Loan Party) waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Agent or any DIP Lender on which any Borrower or Loan Party may in any way be liable, and hereby ratifies and confirms whatever the DIP Agent or any DIP Lender may do in this regard, (b) all rights to notice and a hearing prior to the Agent's or any Lender's taking possession or control of, or to the DIP Agent's or any DIP Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing the Agent or any Lender to exercise any of its |

| | | remedies and (c) the benefit of all valuation, appraisal, marshalling and exemption laws.<br><br>*(See Section 7.03 of the DIP Credit Agreement)* |
|---|---|---|
| (s) | Perfection Other than Under State Law: | All of the Security Interests granted pursuant to the DIP Security Agreement (a) constitute valid and enforceable security interests in all of the Collateral in favor of the DIP Agent, for the benefit of each of the DIP Lenders, as collateral security for all of the Obligations, enforceable in accordance with the terms of the DIP Security Agreement, and (b) are prior to all other Liens on the Collateral in existence, except for Permitted Priority Liens. Subject to the terms of the Financing Order, upon the filing of financing statements in the jurisdiction of formation or incorporation, as applicable, of the respective Grantors, and, to the extent required by Applicable Law, with respect to the Security Interests in Copyrights, Patents and Trademarks that are registered in the United States, the filing of appropriate notices of such Security Interests with the United States Copyright Office and the United States Patent and Trademark Office, as applicable, the Security Interests will be perfected first priority security interests in all Collateral in which a security interest can be perfected by means of filing; and upon delivery to the Agent of the certificates representing the Collateral consisting of Certificated Securities, the Security Interests will be perfected first priority security interests in such Collateral.<br><br>*(See Section 3.4 of the DIP Security Agreement)* |
| (t) | Professional Fee Carveout: | The liens of the DIP Agent (for the benefit of the DIP Lenders) on the DIP Collateral and the Superpriority Claims shall be subject to a Carveout (the "Carveout") in the aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget (defined below) for the applicable Carveout Professional for the period commencing on the Filing Date and ending on the Termination Date and (ii) the aggregate amount of allowed fees and expenses that accrue during the period commencing on the Filing Date and ending on the Termination Date. The Carveout shall be reduced dollar-for-dollar by any payments of fees and expenses to the applicable Carveout professionals. The Carveout shall also include quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court. A |

|     |     |     |
| --- | --- | --- |
|     |     | reserve corresponding to the Carveout in an amount not to exceed the maximum amount of the Carveout will be established and maintained under the Revolving DIP Facility.<br><br>Notwithstanding anything to the contrary herein, no portion of the Carveout may be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of actions against the Prepetition Senior Secured Lenders, the Prepetition Agent, the DIP Agent or the DIP Lenders, or in connection with challenging or raising any defenses to the prepetition obligations under the Prepetition Senior Credit Agreement, the obligations under the DIP Financing Documents (as defined below), or the liens of the Prepetition Agent (for the benefit of the Prepetition Senior Secured Lenders) or the DIP Agent (for the benefit of the DIP Lenders).<br><br>*(See 'Carveout' definition in the Interim DIP Order and Section 3.25 of the DIP Credit Agreement)* |
| (u) | Representations and Warranties: | Customary for financings of this type.<br><br>*(See Article III of the DIP Credit Agreement)* |
| (v) | Covenants: | Customary for facilities of such type and size, and in any event including, without limitation, a weekly test of the Borrower's actual performance to the projections in the Budget, with agreed variances to be applied to each of collections, sales or accrued revenues, and expenses, and with an overall variance to the Budget test to be applied. Testing will commence the Monday following the first full week of the Cases.<br><br>The DIP Facility also will require the Debtors to provide financial reporting consistent with that required in the Prepetition Senior Credit Agreement and that certain Forbearance Agreement dated as of November 25, 2014, by and among, Borrower, Prepetition Senior Secured Lenders, and the Prepetition Agent.<br><br>*(See Articles V (Affirmative Covenants) and VI (Negative Covenants) of the DIP Credit Agreement))* |
| (w) | Events of Default: | The DIP Facility provides for usual and customary events of defaults for facilities of this type, including, but not limited to: |

(a) The failure of the Court to enter the DIP Orders at the times and in the form described in Annex B to the DIP Credit Agreement;

(b) Entry of an order without the prior consent of the DIP Agent amending, supplementing or otherwise modifying an Interim or Final DIP Order;

(c) Reversal, vacation or stay of the effectiveness of any Interim or Final DIP Order;

(d) The filing of any motion to dismiss the cases or convert the Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Cases or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code;

(e) Termination or shortening of the Debtors' exclusivity periods under Section 1121 of the Bankruptcy Code;

(f) Appointment of a chapter 11 trustee;

(g) Any sale of, or motion to sell, all or substantially all assets pursuant to Section 363 of the Bankruptcy Code that does not provide sufficient proceeds to cause the DIP Facility and Existing Obligations to be indefeasibly paid in full, in cash, unless consented to in writing by DIP Agent; provided, however, if such sale, or motion to sell, provides that the DIP Facility and the Existing Obligations are to be indefeasibly paid in full, in cash, no such consent will be needed by the DIP Agent;

(h) Appointment of an examiner with enlarged powers relating to the operation of the business of the Debtors;

(i) If Consensus Advisors ceases to be investment banker for the Debtors (the "IB Event") and the Debtors have not appointed a replacement investment banker acceptable to DIP Agent within 5 business days following such IB Event;

(j) If Brian Davies or another employee of Capstone is no longer Chief Restructuring Officer of the

Borrower (the "CRO Event") and the Debtors have not appointed a replacement chief restructuring officer acceptable to DIP Agent within 5 business days following such CRO Event;

(k) Failure by the Debtors to satisfy the covenants and milestones set forth on Annex C to the DIP Credit Agreement regarding one or more sales of the DIP Collateral;

(l) Any motions to sell the Collateral or approve procedures regarding the same, any plan of reorganization or liquidation (or disclosure statement or supplements or amendments related thereto), or any orders approving or amending any of the foregoing, are not in form and substance acceptable to DIP Agent;

(m) If Borrower shall fail to maintain sufficient projected borrowing capacity to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional borrowing capacity to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full prior to such time that all obligations under the DIP Facility are indefeasibly paid in full;

(n) Granting of relief from the automatic stay in the Cases to permit foreclosure or enforcement on assets of Borrower or any Guarantor;

(o) Entry of an order granting any super-priority claim or lien which is senior to or *pari passu* with the claims under the DIP Facility;

(p) Payment of or granting adequate protection with respect to prepetition debt (other than as provided herein or as consented to by the DIP Agent and approved by the Bankruptcy Court);

(q) Any challenge to the validity of the liens in favor of or claims held by the DIP Agent or the DIP Lenders (excluding challenges by parties other than a Debtor that are not inconsistent with the terms and conditions of the then applicable

|     |     | Order); |
| --- | --- | --- |
|     |     | (r) The filing of a plan of reorganization in which the DIP Facility and Existing Obligations are not paid in full, in cash, on or before the effective date of such plan; |
|     |     | (s) The liens or super-priority claims granted with respect to the DIP Facility cease to be valid, perfected and enforceable in any respect; |
|     |     | (t) The loss of any key management or other employees of the Debtors; and |
|     |     | (u) Breach of the DIP Financing Documents. |
|     |     | *(See Section 7.01 of the DIP Credit Agreement)* |
| (x) | Remedies Upon Default: | The DIP Agent may (a) suspend or terminate the Revolving Loan Commitment and the obligations of Agent and the Lenders with respect thereto, in whole or in part, (b) declare all or any portion of the Obligations, including, without limitation, all or any portion of any Loan payable in connection with a repayment or prepayment of all or any portion of a Loan, to be forthwith due and payable; (c) exercise any rights and remedies provided to Agent and the Lenders under any Loan Document and/or at law or equity, including all remedies provided under the UCC, and (d) enforce any and all Liens and security interests created pursuant to the DIP Credit Agreement and the DIP Security Agreement.

*(See Section 7.02 of the DIP Credit Agreement)* |
| (y) | Amendments: | No amendment, modification or waiver of, or consent with respect to, any provision of the documents (other than any subordination or intercreditor agreements, to the extent that the amendment or modification thereof does not expressly require consent of the Borrower) shall in any event be effective unless the same shall be in writing and signed by (a) the Borrower, (b) the Agent, and (c) the Lenders, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. |

| | | |
|---|---|---|
| | | *(See Section 11.01 of the DIP Credit Agreement)* |
| (z) | Indemnification and Exculpation: | The DIP Credit Agreement contains customary provisions providing for the Debtors' indemnification and exculpation of the DIP Agent and the DIP Lenders, except to the extent that any such claims that arise solely from the gross negligence or willful misconduct of the indemnified party. *(See Section 9.02 of the DIP Credit Agreement)* |
| (aa) | Releases: | Releases to be granted in favor of the Prepetition Senior Secured Lenders and the DIP Lenders |
| (bb) | Prohibited Orders: | See events (including the granting of certain motions or entries of certain orders) that would constitute an "Event of Default" under the DIP Credit Agreement. |

## V.   Disclosures

22.    The required disclosures under Local Rule 4001-2(a)(i) are limited to seeking approval of (i) the immediate grant of liens in avoidance actions (disclosure required under Bankr. L. R. 4001-2(a)(i)(D)), (ii) the deemed "roll up" of pre-petition secured debt into post-petition secured debt (disclosure required under Bankr. L.R. 4001-2(a)(i)(E)), (iii) waiver any surcharge of costs or expenses under Bankruptcy Code sections 506(c) and 552(b) (disclosure required under Bankr. L.R. 4001-2(a)(i)(C) and (E)), and (iv) the placement of liens on the debtors' causes action arising from avoidance actions under sections 544, 545, 547, 548, and 549 under the Bankruptcy Code (disclosure required under Bankr. L.R. 4001-2(a)(i)(D)).

23.    These terms are justified because the Debtors are in immediate and critical need of the DIP Facilities. As discussed above and further below, the Debtors were unable to obtain financing on an unsecured, administrative expense basis. The only acceptable proposals that would provide the critical liquidity to the Debtors were provided after extensive negotiations with the DIP Lenders on the terms set forth in the

DIP Credit Agreement and the DIP Orders.  Without this financing, the Debtors would

not be able to pay their employees or vendors, which is essential to operating their

business as a going concern and, ultimately, exiting these Cases.

## VI.    Basis for Relief Requested

### A.    The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Bankruptcy Code Section 364(c).

24.    As debtors-in-possession, the Debtors are authorized to operate their

businesses under Bankruptcy Code section 1108.  As part of that operation, the Debtors

may incur unsecured debt in the ordinary course of business.  See 11 U.S.C. § 364(a).

The Bankruptcy Code offers debtors-in-possession additional flexibility to the extent they

need additional credit, but cannot attract such credit on unsecured terms.

25.    Section 364 of the Bankruptcy Code governs the ability of debtors-in-

possession to incur debt or obtain credit postpetition.  More specifically, section

364(c)(1)-(3) of the Bankruptcy Code addresses the incurrence of postpetition credit on a

non-priming basis, providing as follows:

> (c)    If the [debtor in possession] is unable to obtain unsecured credit
> allowable under section 503(b)(1) of this title as an administrative
> expense, the Court, after notice and a hearing, may authorize the obtaining
> of credit or the incurring of debt –
>
> (1)    with priority over any or all administrative expenses of the
> kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is
> subject to a lien.

11 U.S.C. § 364(c).

26.     In evaluating proposed post-petition financing under Bankruptcy Code

section 364(c), courts perform a qualitative analysis and generally consider similar

factors, including whether:

(a)     unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b)     the credit transactions are necessary to preserve assets of the estate;

(c)     the terms of the credit agreement are fair, reasonable, and adequate;

(d)     the proposed financing agreement was negotiated in good faith and at arms'-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

(e)     the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011)

(applying the first three factors); In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D.

Pa. 1991) (applying the first three factors in making a determination under Bankruptcy

Code section 364(c)); In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987

(same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying

all factors in making a determination under Bankruptcy Code section 364(d)).

27.     For the reasons discussed below, the Debtors satisfy the standards required

to obtain post-petition financing on a secured superpriority lien basis under Bankruptcy

Code section 364(c).

**B.      The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

28.     Whether debtors were unable to obtain unsecured credit is determined by

application of a good faith effort standard, and debtors must make a good faith effort to

demonstrate that credit was not available without granting a security interest. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing); In re Gen. Growth Props., Inc., 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).  The required showing under Bankruptcy Code section 364 that unsecured credit was not available is not rigorous.  See, e.g., Bray v. Shenandoah Fed. Sav. & loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that Bankruptcy Code section 364(d) imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise.").

29.     Here, as detailed in the Declaration, despite the Debtors' efforts, the Debtors have been unable to obtain unsecured credit sufficient to finance their operations. Moreover, the Debtors cannot obtain alternative financing of the magnitude proposed under the Interim DIP Order on an unsecured basis, even if the resulting claim were to be allowed as an administrative claim.  Finally, the DIP Lenders have agreed to fund the Debtors only if they are given the added protection and benefits provided by the Interim DIP Order.  Given the troubles facing both online and clothing retailers, as evidenced by the recent liquidations of SkyMall LLC, dELIA*s, Inc., and Cache, combined with the Debtors' continued projected losses, the Debtors quickly found that most potential third-party lenders and equity investors were not interested in providing financing to the Debtors.  Without the DIP Facility, the Debtors would be assured of a piecemeal liquidation under chapter 7 of the Bankruptcy Code, rather than a proposed going concern sale that will maximize value.

30.    Therefore, the Debtors respectfully submit that their efforts to obtain post-petition financing satisfy the standards required under Bankruptcy Code section 364(c). See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where Debtor's best business judgment indicated financing was necessary and reasonable benefit to the estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990 (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extent the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

C.    **The Proposed Financing Is Necessary to Preserve the Assets of the Debtors' Estates.**

31.    Pending a going concern sale, the Debtors intend to operate their business in the ordinary course and require immediate access to post-petition financing. Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including funding payroll for the Debtors' employees. The Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on the operation of their business without additional financing. The Debtors' ability to maintain their business pending sale is dependent on their ability to continue to operate, and the Debtors cannot operate unless they can fund payments for post-petition rent, payroll, goods, services, and other operating expenses. The proposed DIP Facility thus is essential to the Debtors' continued operational viability and will provide the Debtors with the opportunity to maximize value through a going concern sale.

32.     The alternative in this case is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and constituencies involved in this case." In re Dynaco Corp., 162 B.R. 389, 396 (Bankr. D.N.H. 1993). Because this result would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of the Motion is warranted. Id. at 394 (noting that "'it is apparent that Congress intended business under reorganization to proceed in as normal a fashion as possible.'") (quoting In re Prime, Inc., 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

33.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing under the terms of the DIP Financing Agreements to continue their operations pending a going concern sale.

**D.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

34.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

35.     Section 364(d) requires that adequate protection be provided to holders of liens that are to be subordinated by a superpriority post-petition lien. Here however, the prepetition senior secured lenders presently hold a first priority security interest position in the amount of almost $30 million, and there is a high degree of confidence that any lienholder whose interests are junior to those of the prepetition senior secured lenders would be deemed to be unsecured based on any reasonable valuation of the collateral. The only prepetition lienholder whose lien is impacted by the imposition of a postpetition superpriority lien are the Prepetition Senior Secured Lenders, whose liens are being paid in full in conjunction with the DIP Facility. As such, no adequate protection is warranted as there is no value in any junior lien that would be entitled to such protection. Therefore, the granting of the priority lien to the DIP Lenders may be awarded without the need to award adequate protection rights to any Eastward or any of the Junior Secured Creditors.

36.     The terms of the DIP Facility and the proposed DIP Orders were negotiated in good faith and at arms'-length between the Debtors and the DIP Lenders and DIP Agent, resulting in an agreement designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through completion of a going concern sale.

**E.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

37.     A debtor's decision to enter into a post-petition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such

facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 ("cases consistently reflect that the court's discretion under Bankruptcy Code section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as to benefit a party-in-interest").

38.    Generally, courts give broad deference to business decisions of debtors-in-possession.  See, e.g., Richmond Leasing v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, a Bankruptcy Court generally will respect debtors-in-possessions' business judgment regarding the need for and the proposed use of funds.

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

In re Ames Dep't Stores, Inc., 115 B.R. at 40.  The power of the debtors-in-possession to incur secured debt follows necessarily from the general power of the debtors-in-possession to operate their businesses in the exercise of their business judgment.  See 11 U.S.C. § 1108.

39.    In the present Cases, the Debtors' decision to obtain the postpetition financing represents an exercise of sound business judgment in the continued operation of the Debtors' business to allow them to finance their day-to-day operations including, without limitation, continuing to pay their employees and maximize the potential recovery to creditors.

**F.**    **Bankruptcy Code Section 363 Authorizes the Debtors to Use Cash Collateral.**

40.    Bankruptcy Code section 363(c)(2) provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing.  See 11 U.S.C. § 363(c).

41.    Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

42.    Bankruptcy Code section 361 provides that:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –
>
> (1) requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.  "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 289 (Bankr . S.D.N.Y.

1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.") (internal quotation marks omitted) (citation omitted)).

43.    Approval of the DIP Credit Agreement and, as required therein, the application of Cash Collateral to the obligations under the Prepetition Senior Credit Agreement, will provide the Debtors with immediate and ongoing access to the funds necessary to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtors will be forced to immediately cease operations, which would (i) result in irreparable harm to their business, and (ii) deny the Debtors the opportunity to maximize value.

44.    Because the Debtors' postpetition Cash Collateral is earmarked for application against the balance of the Prepetition Senior Credit Agreement, the borrowing under the DIP Credit Agreement and authorization for the use of cash collateral is critically necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. In addition, the availability under the DIP Credit Agreement will provide confidence to the Debtors' vendors, thereby aiding in the administration of the Cases and promoting a successful reorganization.

45.    Here, the interests of the Prepetition Senior Secured Lenders are adequately protected for purposes of Bankruptcy Code section 363(e) because the Prepetition Senior Secured Lenders are the DIP Lenders and have agreed to the terms of the DIP Credit Agreement and DIP Orders, the Debtors intend to preserve value by maintaining operations pending a sale of substantially all their assets, and pursuant to the

DIP Orders, the Prepetition Senior Secured Lenders will have, among other things, the benefit of replacement liens and superpriority administrative expense claims to the extent set forth therein to protect the Prepetition Senior Secured Lenders from any diminution in value of their interest in the Debtors' assets.

46.    The Debtors believe that such protections are adequate under the circumstances.  Further, given the significant value that the Debtors stand to lose if the DIP Facilities are not approved and immediately implemented, such protections are wholly appropriate and justified.

**VII.    Interim Order and Final Hearing**

47.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable to avoid immediate irreparable harm to a Debtor's estates, and fix the time and date prior to the final hearing for parties to file objections to the Motion, but in no event greater than thirty (30) days following the Court's entry of a DIP Interim Order.

48.    The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing, pending the Final Hearing, in order to continue their operations and administer the Cases.  Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition obligations, including payroll obligations to employees, and otherwise would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and effectively foreclosing the possibility of the possibility of maintaining their operations through the time of a going concern sale.

49.    Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### VIII.    Immediate Relief Is Necessary

50.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these cases in an orderly and efficient manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates. For these reasons, the Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

### IX.    Waiver of any Applicable Stay

51.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate their business without interruption and to preserve the value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-

day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## X.    Notice

52.    Notice of this Application shall be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (iii) all taxing authorities whom the Debtors believe may have, or may, assert claims against the Debtors or any of the Debtors' assets; (iv) the United States Trustee; (v) the DIP Agent and DIP Lenders; and (vi) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by the Local Rules in effect in this District. The Debtors submit that under the circumstances, no other or further notice need be given.

## XI.    No Prior Request

53.    No previous motion for the relief sought herein has been made to this or any other court.

## XII.    Conclusion

**WHEREFORE**, the Debtors respectfully request that this Court enter the Interim DIP Order substantially in the form annexed hereto: (a) authorizing the Debtors to obtain the postpetition financing from the DIP Lenders; (b) setting the Final Hearing; (c) following the Final Hearing, approving the postpetition financing on a final basis; (d) authorizing the Debtors to execute any and all documents and take such other actions as necessary to effectuate the transactions contemplated by the postpetition financing;

and (e) granting such other and further relief as this Court deems just and proper under the circumstances.

Dated:   March 23, 2015

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Steven K. Kortanek
Steven K. Kortanek (Del. Bar No. 3106)
Ericka F. Johnson (Del. Bar No. 5024)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail:  skortanek@wcsr.com
E-mail:  erjohnson@wcsr.com
E-mail:  mpatterson@wcsr.com

-and-

**BURNS & LEVINSON LLP**
Scott H. Moskol
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3522
Facsimile: (617) 345-3299
E-mail:  smoskol@burnslev.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*