IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KARMALOOP, INC., et al., | Case No.  15- 10635 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| | **Proposed Bidding Procedures Objection Deadline:** 4/13/15 at 4:00 p.m.[2] (ET) |
| | **Proposed Bidding Procedures Hearing:** 4/15/15 at 12:30 p.m. (ET) |
| | **Proposed Sale Objection Deadline:** 5/13/15 at 4:00 p.m. (ET) |
| | **Proposed Sale Hearing:** 5/20/15 at time to be determined |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING AND
AUTHORIZING (A) BIDDING PROCEDURES IN CONNECTION WITH THE
SALE OF THE DEBTORS' ASSETS; (B) THE FORM AND MANNER OF
NOTICE OF THE SALE HEARING AND (C) RELATED RELIEF; AND (II) AN
ORDER AUTHORIZING (A) THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) THE
DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER
THE ASSET PURCHASE AGREEMENT; (C) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH; AND
(D) GRANTING RELATED RELIEF**

Karmaloop, Inc. and its subsidiaries, the debtors and debtors in possession

(collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), by

and through their proposed undersigned counsel, file this motion (the "Motion")

requesting entry of (i) an order approving bidding procedures (the "Bid Procedures

Order"), attached hereto as Exhibit A, and (ii) an order (a) authorizing the sale of the

Debtors' assets free and clear of all liens, claims and encumbrances, (b) authorizing the

Debtors to enter into and perform their obligations under the Asset Purchase Agreement;

---

[1]     The Debtors and the last four digits of their respective federal taxpayer identification numbers are
as follows: Karmaloop, Inc. - 3934; KarmaloopTV, Inc. – 8230.  The Debtors' address is 334
Boylston Street, Suite 500, Boston, MA 02116.

[2]     All hearing dates and objection deadlines are subject to the Court's availability.  A notice with the
confirmed dates and times for such hearings and objection deadlines will be separately filed.

and (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith (the "Sale Order"), attached hereto as Exhibit B. In support of this Motion, the Debtors rely on and incorporate by reference the Declaration of Brian L. Davies, Jr. in Support of First Day Motions [D.I. 3] (the "Davies Declaration"), previously filed with the Court.  In further support of the Motion, the Debtors, by and through their undersigned proposed attorneys, respectfully represent as follows:

## I.     Preliminary Statement

Although the Debtors have conducted an organized sales process for months prior to the Petition Date, the Debtors were unable to find a buyer for their businesses.  In the weeks leading up to the Petition Date, it became evident  that, if the Karmaloop brand and name were to survive through a Chapter 11 process, the Debtors would need to sell their assets.  As the Debtors had no viable purchasers, the Debtors and the Prepetition Senior Lenders[3] commenced arms-length discussions regarding the purchase of the Debtors' business by the Prepetition Lenders, in which as a fallback, the Prepetition Senior Lenders would serve as a Stalking-Horse Bidder (the "Sale").  These negotiations resulted in a proposed asset purchase agreement by and among the Debtors and Comvest Capital II, L.P as Agent (the "Stalking Horse Bidder" or the "Buyer") for the Senior Lenders (the "APA"), which provides that the Buyer (or its nominee) will credit bid $13 million (in addition to providing other consideration).

---

[3]     Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Davies Declaration.

2

The Debtors are committed to carrying out a robust and responsible bid solicitation process. The Debtors' sale process has two distinguishing features; <u>first</u>, in sharp contrast to other retail bankruptcies filed in this district, the Debtors are not proceeding with a going out of business sale, but rather are proceeding with a going concern sale; and <u>second</u>, the Debtors' sale process provides for a considerable marketing period until an auction is held – 57 days from the Petition Date. This will result in a sufficient time to have a vibrant marketing period for the Sale along with providing the Creditors' Committee or any other party in interest sufficient time to address any concerns, if any, they may have with the relief sought by this Motion.

Moreover, the Bidding Procedures have been designed to maximize the value for which the Debtors' business can be sold through an auction process. In these Bidding Procedures, the Buyer has agreed not to seek certain common stalking horse protections such as a break-up fee or expense reimbursement. Further, the Bidding Procedures provide that if another third party purchaser wishes to come forward and serve as the stalking horse, then such third party purchaser may become the stalking horse bidder and propose a break-up fee, expense reimbursement, and similar protections, subject to the terms of the Bidding Procedures.[4] Finally, the Senior Lenders have supported the efforts of the Debtors to retain an investment banker (the "<u>IB</u>") to continue marketing the sale of the Debtors' assets during the sales process.

---

[4]    The Buyer reserves the right to credit bid the entire amount of the debt owed pursuant to the Senior Facilities.

## II.    Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The bases for the relief requested herein are sections 363(b), (f) and (m), 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a), (c) and (d), 7004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## III.    Introduction

5.      On March 23, 2015 (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On March 25, 2015, this Court ordered that the Debtors' two cases be jointly administered.

6.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No requests have been made for the appointment of a trustee or an examiner in these Cases,

and no official committee has yet been appointed by the Office of the United States Trustee.

7.      After successful negotiations with the Prepetition Senior Lenders, the Debtors commenced these chapter 11 cases with the support of the Prepetition Senior Lenders, who agreed to provide debtor-in-possession financing facility sufficient to conduct these cases in a manner designed to maximize value for the Debtors' going concern business, and to provide the best opportunity to preserve value and jobs and minimize disruption to the Debtors' business (which facility will be provided by the Postpetition Senior Lenders).  As noted above, the Senior Lenders (i.e., the Prepetition Senior Lenders and Postpetition Senior Lenders) and the Debtors also agreed to the APA as well as bidding procedures to promote a robust sale process and, by this Motion, seek approval of Bidding Procedures and a Sale of the Debtors' assets.

## IV.    Relief Requested

8.      By this Motion, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit A:

    (a)    authorizing and approving bidding procedures in connection with the receipt and analysis of competing bids for certain assets of the Debtors, substantially in the form attached as Exhibit 1 to the Bid Procedures Order (the "Bidding Procedures"), which is attached to the Bid Procedures Order as Exhibit 1;

    (b)    authorizing and approving procedures for the assumption and assignment of the Assigned Contracts (as defined in the Bid Procedures Order, collectively, the "Assigned Contracts") in connection with the Sale;

    (c)    approving the form and manner of notice of the Sale and hearing thereon, substantially in the form attached to the Bid Procedures Order as Exhibit 2 (the "Sale Notice");

(d)  establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:[5]

(i)  Sale Objection Deadline: May 13, 2015 at 4:00 p.m. as the deadline to object to the Sale transactions and/or the assumption and assignment of Assigned Contracts or cure amounts related thereto (the "Sale Objection Deadline");

(ii)  Bid Deadline: May 13, 2015 at 5:00 p.m. as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

(iii)  Auction: May 19, 2015 at 10:00 a.m. as the date and time the auction, if one is needed (the "Auction"), which will be held at the offices of Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Avenue, Suite 1501, Wilmington, Delaware 19801 (or such other place, date, and time as the Debtors may designate in writing in consultation with the Agents and the Creditors' Committee);

(iv)  Sale Hearing: May 20, 2015 at a time to be determined, as the proposed date of the sale hearing (the "Sale Hearing"), which will be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, at 824 North Market Street, Courtroom # 4, Wilmington, Delaware 19801.

9.  By this Motion, the Debtors also seek entry of an order, authorizing (a) the sale of certain assets of the Debtors free and clear of all claims, liens, liabilities, rights, interests, and encumbrances, (b) the Debtors to enter into and perform their obligations under the APA, (c) the Debtors to assume and assign certain executory contracts and unexpired leases; and (d) granting related relief.

---

[5]  All hearing dates and objection deadlines are subject to the Court's availability. A notice with the confirmed dates and times for such hearings and objection deadlines will be separately filed.

6

## V.    Factual Background

10.    The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the Davies Declaration, filed on the Petition Date and fully incorporated herein by reference.

### A.    Prepetition Capital Raise Efforts

11.    In the summer and fall of 2013, the Debtors approached the capital markets with the help of their prior investment bankers.  For approximately six months, the Debtors and their prior investment bankers contacted over 120 potential investors but were unable to consummate a capital transaction.  In December 2013, the Debtors parted ways with their prior investment bankers and hired Consensus Advisory Services LLC and Consensus Securities LLC (together, "Consensus") to re-approach the capital markets to seek growth capital.

12.    From January 2014 to October 2014, Consensus approached over 160 parties about investing in the Debtors.  While many of these conversations were promising and resulted in several parties' conducting due diligence, ultimately no capital transaction was consummated, leaving the Debtors with very limited working capital.

### B.    Decision to Sell the Debtors' Assets; Selection of Stalking Horse Bidder

13.    In late 2014, the Debtors, with the support of the Prepetition Senior Lenders, requested that Consensus pursue a formal sale process.  In late December 2014, the Debtors and Consensus executed an amendment to Consensus's engagement agreement.  While limited conversations with some potential strategic and financial

acquirers occurred in late December 2014, the Company and Consensus began their sale effort in earnest in January 2015.

14.    With guidance from Consensus, the Company revised its sale marketing materials and prepared updated financial information and projections.  An electronic data room was also established and made available to qualified parties who executed non-disclosure agreements.

15.    Consensus once again reached out to the financial markets, making contact with an expanded set of over 150 investors as well as strategic prospects. Through this process, and Consensus's efforts in 2014, 56 parties signed confidentiality agreements with the Debtors prior to the Petition Date and were provided with marketing materials and, in some instances, access to the data room and further due diligence.

### C.    Negotiation of Stalking Horse Bid and Selection of Stalking Horse Bidder

16.    The prepetition marketing process did not yield any bids for the Debtors' businesses of sufficient value and ability to close, in the Debtors' business judgment.  As a result, the Debtors turned to negotiating a purchase of the Debtors' businesses on a going concern basis by the Prepetition Senior Lenders, or their nominee, through a credit bid. The Debtors negotiated in good faith – and at arms' length – with the Prepetition Senior Lenders to reach agreement on the terms of the APA.  The Debtors believe, in the exercise of their business judgment, that having the Senior Lenders or their nominee serve as the Stalking Horse Bidder, with a robust additional marketing process and auction in these Cases, will lead to a value-maximizing transaction for the benefit of all of the Debtors' stakeholders.

8

17.     As part of the various financing and sale negotiations, the Debtors have requested postpetition financing for the fees to be charged by Debtor's investment banker as well as a professional carveout from the Senior Lenders for a success fee to be earned by Debtor's investment banker upon the closing of the Sale, subject to the debtor-in-possession financing order (D.I. 47) and the Postpetition Loan Documents (as defined therein). All parties believe that the retention of an investment banker to further the sales process during this bankruptcy will help to fully maximize the value of the Debtors' estates and assets.

## VI.     Overview of the Proposed Sale

### A.     Material Terms of the APA

18.     The principal terms of the APA are summarized in the following chart.[6]

| APA Provisions | Summary Description |
| --- | --- |
| **APA Parties** | Karmaloop, Inc., a Delaware corporation ("Karmaloop"), Karmaloop TV, Inc., a Delaware corporation ("Karmaloop TV") and Comvest Capital II, L.P., acting as agent for the lenders under the Pre-Petition Financing and the DIP Financing ("Buyer"; also referred to as the "Stalking Horse Bidder") |
| **Consideration** | The aggregate purchase price (the "Purchase Price") payable in consideration by Buyer for the sale, transfer, assignment, conveyance, and delivery by the Seller to the Buyer of the Lots shall consist of the following: $13 million credit bid to be charged against the Senior Facilities and first lien position on all of the Acquired Assets under the Senior |

---

[6]     The following summary of the APA is provided for the convenience of the Court and parties in interest. To the extent that there are any discrepancies between this summary of the APA and the APA, the terms and language of the APA shall govern. Capitalized terms used but not otherwise defined in this summary or previously used in the Motion shall have the meanings ascribed to such terms in the APA.

| APA Provisions | Summary Description |
|---|---|
| | Facilities; <u>plus</u><br><br>The assumption at the Closing by the Buyer of the Assumed Liabilities from the Seller; <u>plus</u><br><br>any Cure Amounts required to be paid by Buyer in accordance with the terms hereof. |
| **Acquired Assets** | All assets of the Debtors, classified as Lot 1 (all assets other than those in Lot 2) and Lot 2 (equity interests in Karmaloop Europe AG and any Acquired Assets that are specifically and solely used by that business and its subsidiaries) including:<br><br>(a)    all Accounts Receivable;<br><br>(b)    all Inventory;<br><br>(c)    all tangible personal property related to, or used or useful in or held for use in the conduct of, the Business, including equipment, machinery, tools, supplies, spare parts, trucks, cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of any Owned Real Property and Leased Real Property;<br><br>(d)    all customer lists, customer files, and customer accounts relating to the Business;<br><br>(e)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to <u>Section 2.6</u> of the APA;<br><br>(f)    all open purchase orders with suppliers related to the Business;<br><br>(g)    to the extent assignable, all of Seller's rights under all third-party manufacturing warranties;<br><br>(h)    the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of (i) the loss, destruction, or condemnation of any Acquired Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities related to Acquired Assets in a given Lot if such Lot has been purchased by the Buyer;<br><br>(i)    to the extent transferable, all Insurance Policies other than the Seller's Directors and Officers Liability Policy that, on or prior to |

| APA Provisions | Summary Description |
|---|---|
| | the Closing, Buyer designates in writing to Seller as Acquired Assets hereunder, and all rights and benefits of Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any order of the Bankruptcy Court with respect thereto), including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; |
| **Acquired Assets (Continued)** | (j)     all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors, and agents of Seller or with third parties to the extent relating to the Business;<br><br>(k)     subject to Section 2.6(h) of the APA, any Assumed Permits;<br><br>(l)     all litigation claims and causes of action (including causes of action under Chapter 5 of the Bankruptcy Code) (i) against landlords, vendors, or other counterparties who are party to (or Affiliates of a party to) any Assumed Contract or open purchase order, or (ii) otherwise arising under or related to the Acquired Assets (including, for the avoidance of doubt, (x) all Assumed Contracts and (y) any claim or cause of action arising after the Closing under confidentiality agreements or similar agreements delivered in favor of the Seller as such relate to the Lots acquired by Buyer);<br><br>(m)     any rights against parties who have executed confidentiality agreements in favor of Seller, to the extent such confidentiality protections directly or indirectly protect the Acquired Assets;<br><br>(n)     all rights in and to Intellectual Property; provided, however, that if Buyer is not acquiring all the Lots, then it is acknowledged that any purchaser of Lot 2 shall be entitled to receive an IP License and a Trademark Agreement as part of the Acquired Assets for Lot 2;<br><br>(o)     any claims of the Seller against Buyer and/or Buyer's Affiliates, including without limitation the Existing Lenders;<br><br>(p)     Seller's Records to the extent related to the other Acquired Assets; |

| APA Provisions | Summary Description |
|---|---|
| | (q)    any Owned Real Property; |
| | (r)    all stock or other equity owned by Sellers in any subsidiary entities (subject to Lot 2 sale); and |
| | (s)    all other tangible and intangible assets, properties, rights, and claims of the Seller of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business or which relate to the Acquired Assets (in each case, other than the Excluded Assets) not otherwise described above. |
| **Excluded Assets** | Collectively, the following assets of Seller: (a) all of Seller's certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of Seller as a corporation, limited liability company, or other entity; (b) all Records related solely to Taxes paid or payable by Seller, _provided_ that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (c) all Cash of Seller as of the Closing, and all restricted cash deposits of Seller held by any Person and relating to Acquired Assets; (d) all assets with respect to any income or other Taxes of Seller, whether or not relating to the Business; (e) all equity securities representing ownership of Karmaloop or Karmaloop TV; (f) all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts; (g) all rights (including rights of set-off and rights of recoupment (including any such item relating to the payment of Taxes)), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Seller against third parties, including all such items relating to (x) Taxes, and all (y) avoidance claims or causes of action arising under the Bankruptcy Code or applicable state Law, but excluding claims and causes of action expressly included in clause (l) of the definition of "Acquired Assets"; (h) any (i) confidential personnel and medical Records pertaining to any Covered Employee to the extent the disclosure of such information is prohibited by applicable Law and (ii) other Records that Seller is required by Law to retain or that Seller determines is necessary or advisable to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings; _provided_ |

| APA Provisions | Summary Description |
|---|---|
| | that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (i) any documents and agreements of Seller relating to the sale or other disposition of any Excluded Assets; (j) all Permits other than the Assumed Permits; (k) all assets maintained pursuant to or in connection with any Employee Benefit Plan (l) any claim or cause of action arising prior to the Closing under confidentiality agreements or similar agreements delivered in favor of the Seller, except as expressly included in clauses (j) or (m) of the definition of "Acquired Assets"; and (m) all assets set forth on Annex 2 of the APA. |
| **Excluded Liabilities** | (a)    Everything other than Assumed Liabilities, including, without limitation, the following:<br><br>(b)    all Taxes of Seller, including Taxes imposed on Seller under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax Law (for the avoidance of doubt, and without limitation of the foregoing, any Liability related to sales tax shall be an Excluded Liability);<br><br>(c)    all Liabilities of Seller relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;<br><br>(d)    all Liabilities of Seller relating to or arising from any collective bargaining agreement (including any related multi-employer pension plan);<br><br>(e)    all Liabilities relating to severance, retention, and termination agreements with the Covered Employees and all past officers, directors or employees of Seller;<br><br>(f)    all Liabilities arising out of, relating to, or with respect to any notice pay or benefits (including under COBRA) and claims under the WARN Act with respect to any Covered Employee or any other current or former employees of Seller; |

| APA Provisions | Summary Description |
|---|---|
| **Excluded Liabilities** <br><br> **(Continued)** | (g)    all Liabilities arising out of, relating to, or with respect to any Employee Benefit Plan (including any Liabilities related to any Employee Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or IRC Section 412); <br><br> (h)    all Liabilities of Seller in respect of Indebtedness (except to the extent of any Cure Amounts under any Assumed Contracts, and except with respect to any capitalized leases that are Assumed Contracts); <br><br> (i)    all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing by Seller, including any Environmental, Health and Safety Requirements; <br><br> (j)    all Liabilities of Seller under this Agreement and the Related Agreement and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities); and <br><br> (k)    all Liabilities of Seller incurred in connection with, or related to, the administration of the Seller's Chapter 11 Case, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors, and other professional advisors related to the Bankruptcy Case. |
| **Assumption of Executory Contracts and Assignment to the Stalking Horse Bidder** | The Sale Order shall provide for the assumption by Seller, and the assignment to the extent legally capable of being assigned by Seller to Buyer, of the Assumed Contracts on the terms and conditions set forth in the remainder of this Section 2.6 of the APA. <br><br> Buyer shall, no later than one (1) day prior to the hearing on the Sale Order, identify the executory contracts and unexpired leases that Buyer has decided will be Assigned Contracts to be assumed and assigned to Buyer on the Closing Date by providing a list thereof to Seller. |
| **Payment of Cure Amounts** | The Seller shall be paid by Buyer, on or before the Assumption Approval. |
| **Employment Provisions** | The APA contemplates, but does not require, that the Buyer will make employment offers, in its discretion to certain Covered Employees of the Debtors.  The Debtors remain responsible for any obligations to any Covered Employees who are not offered |

| APA Provisions | Summary Description |
|---|---|
| | employment and become so employed by Buyer. |
| **Closing Conditions** | Buyer's Conditions to Closing:<br><br>Subject to Section 7.3 of the APA, Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:<br><br>(a)　　as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) any representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 of the APA shall be true and correct in all respects, and (ii) any other representation or warranty set forth in Article 3 shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect;<br><br>(b)　　Seller shall have performed and complied with Seller's covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects (including delivering all items required under Section 2.8(a)) of the APA;<br><br>(c)　　Seller shall have performed and complied with all of Seller's obligations under the Employee Benefit Plans through the Closing in all material respects;<br><br>(d)　　no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;<br><br>(e)　　the Sale Order entered by the Bankruptcy Court shall have become a Final Order; and<br><br>(f)　　from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect. |

| APA Provisions | Summary Description |
|---|---|
| **Closing Conditions** **(Continued)** | Debtors' Conditions to Closing:<br><br>Subject to Section 7.3 of the APA, Seller's obligation to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:<br><br>(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) any representation or warranty contained in Section 4.1. Section 4.2 or Section 4.3 of the APA shall be true and correct in all respects, and (ii) any other representation or warranty set forth in Article 4 of the APA shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the transactions contemplated hereby or by any Related Agreement;<br><br>(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects;<br><br>(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;<br><br>(d)    the Sale Order entered by the Bankruptcy Court shall have become a Final Order; and<br><br>(e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) of the APA has been satisfied. |
| **Representations, Warranties, and Covenants of Debtors** | As set forth more fully in Article 3 of the APA, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), the Seller provides warranties regarding:<br>(i)    Organization of Seller: Good Standing<br><br>(ii)    Authorization of Transaction<br><br>(iii)    Noncontravention; Consents and Approvals |

| APA Provisions | Summary Description |
|---|---|
| | (iv)   Title to Acquired Assets<br>(v)   Contracts<br>(vi)   Legal Compliance<br>(vii)  Litigation<br>(viii) Environmental, Health and Safety Matters<br>(ix)   Employees and Employment Matters<br>(x)   Employee Benefit Plans<br>(xi)   Real Property<br>(xii)  Permits<br>(xiii) Intellectual Property<br>(xiv) Taxes<br>(xv)  Transactions with Related Parties<br>(xvi) Brokers' Fees |
| **Bid Protections** | Requirement of minimum of $250,000 overbid, plus the amount of any Qualifying Fees or Reimbursements if they are offered, with successive minimum overbid increments of $100,000.<br><br>Minimum cash deposit of $1 million to be a Qualified Bidder.<br><br>Qualifying Fees or Reimbursements may be offered to another party other than the Buyer wishing to serve as the stalking horse and provide the Staring Bid. |

**B.      Provisions to Be Highlighted under the Local Rules**

19.      The APA contains the following terms, conditions and provisions that are

to be highlighted pursuant to Local Rule 6004-1:

| | |
|---|---|
| **Sale to Insider** | The proposed purchaser is not an insider as that term is defined by Bankruptcy Code section 101(14). |

17

| | |
|---|---|
| **Management Agreements** | There are no management agreements. |
| **Releases** | There are releases by the Seller in favor of Buyer, Senior Agents and Senior Lenders, and each of their respective affiliates, officers, directors, Representatives, agents, counsel, consultants, successors, and assigns. |
| **Private Sale/No Competitive Bidding** | The Buyer is serving as the Stalking Horse Bidder. The bid will be subject to higher and better offers at a public auction subject to procedures established by this Court. |
| **Closing and Other Deadlines** | Upon Sale Order becoming a Final Order not later than May 20, 2015, the Sale must be consummated on or before May 27, 2015. |
| **Good Faith Deposit** | None for present proposed Buyer.<br><br>To constitute a Qualified Bid, a bidder must provide a $1 million good faith deposit. |
| **Interim Arrangements with Proposed Buyer** | Operate in the ordinary course. |
| **Use of Proceeds** | Credit Bid to be applied to the Senior Facilities. |
| **Tax Exemption** | None. |
| **Record Retention** | The Debtors are required to preserve Records until the latest of (i) the required retention period for all government contact information, records or documents, (ii) the conclusion of all bankruptcy proceedings relating to the Seller's Chapter 11 Case or (iii) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. |

| | |
|---|---|
| **Sale of Avoidance Actions** | The APA provides that the Acquired Assets include certain of the Debtors' Avoidance Actions. |
| **Requested Findings as to Successor Liability** | The Sale and related transactions are not, and do not amount to, a consolidation, merger, or *de facto* merger of the Purchaser and any of the Debtors or any of the Debtors' estates, there is not substantial continuity between the Purchaser and any of the Debtors, there is no significant common identity between the Purchaser and any of the Debtors, there is no continuity of enterprise between the Purchaser and any of the Debtors, the Purchaser is not a mere continuation of any of the Debtors or any of their estates, and the Purchaser does not constitute a successor to any of the Debtors or any of their estates with respect to any and all claims, including, without limitation, federal or state tax claims, and multi-employer pension plan claims or other pension. |
| **Sale Free and Clear of Unexpired Leases** | Other than those that are Assigned Contracts. |
| **Credit Bid** | Yes: $13 million to be applied to amounts outstanding under the Senior Facilities. |
| **Relief from Bankruptcy Rule 6004(h)** | Yes. |

C.      **Consumer Privacy Compliance**

20.      The Sale will likely include the transfer of "personally identifiable information," (the "PII") as defined in section 101(41A) of the Bankruptcy Code. However, no "consumer privacy ombudsman" need be appointed under section 363(b)(1) of the Bankruptcy Code, because (a) the Debtors' customers have agreed, pursuant to the Debtors' Privacy Policy, to the transfer of PII in connection with a sale such as that

19

proposed by the Debtors, and (b) the Buyer has agreed to adhere to any such privacy

policies applicable to the Debtors.

21.    Section 363(b)(1) of the Bankruptcy Code provides that:

The trustee, after notice and a hearing, may use, sell, or lease, other than in
the ordinary course of business, property of the estate, except that if the
debtor in connection with offering a product or a service discloses to an
individual a policy prohibiting the transfer of personally identifiable
information about individuals to person that are not affiliated with the
debtor and if such policy is in effect on the date of the commencement of
the case, then the trustee may not sell or lease personally identifiable
information to any person unless – (B) after appointment of a consumer
privacy ombudsman in accordance with section 332, and after notice and a
hearing, the court approves such sale or such lease – (i) giving due
consideration to the facts, circumstances, and conditions of such sale or
such lease; and (ii) finding that no showing was made that such sale or
such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

22.    Pursuant to the Debtors' Privacy Policy, [7] in the event that the Debtors go

"through a business transition, such as a merger, acquisition by another company, or sale

of all or a portion of its assets, [PII] will likely be among the assets transferred.

[Customers] will be notified via email of any such change in ownership or control of

[PII]."

23.    Section 363(b)(1) of the Bankruptcy Code requires, with respect to

Debtors' proposed sale and its Privacy Policy, that the sale be "consistent with such

policy...." See 11 U.S.C. § 363(b)(1)(A). Accordingly, the Debtors will comply with the

Privacy Policy by emailing customers whose PII is being transferred.

---

[7]    http://www.karmaloop.com/help/privacy-policy.

24.    Pursuant to Section 6.10 of the APA, the Buyer has agreed to comply with the Debtors' Privacy Policy.  This is an independent basis for compliance with the consumer privacy provisions of section 363 without the necessity of appointing a consumer privacy ombudsman. In re Velocity Express Corp., Case No. 09-13294 (MFW), 2009 WL 6690931, at *7 (Bankr. D. Del. Nov. 3, 2009); see also In re Escada (USA), Inc., Case No. 09-15008 (SMB), 2010 WL 4916435, at *4 (Bankr. S.D.N.Y. Jan. 7, 2010) (finding that no consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy because the purchaser agreed to become the debtor's successor-in-interest as to the customer information and to use the customer information only in accordance with the privacy policy of the debtor).

### VII.    Bid Procedures Order

### A.    Outline of the Bidding Procedures

25.    The Bidding Procedures are intended to permit a fair and efficient competitive sale process, consistent with the timeline of these cases, to confirm that the Stalking Horse Bid is, indeed, the highest or otherwise best offer, or promptly identify the alternative bid that is higher or otherwise better.  Because the Bidding Procedures are attached as Exhibit 1 to the Bid Procedures Order, they are not restated in their entirety herein.  The Bidding Procedures establish, among other things:[8]

(a)    the requirements a Proposed Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder (See Bidding Procedures, at ¶ 3);

(b)    the availability of, and access to, information and the performance

---

[8]    Capitalized terms used but not defined in this paragraph shall have the meanings ascribed such terms in the Bidding Procedures.

21

of due diligence by Potential Bidders (See Bidding Procedures, at ¶ 2);

(c)     the deadlines and requirements for submitting a competing bid and the method and criteria (including minimum consideration and other required elements) by which such a competing bid is to become entitled to be a Qualified Bid sufficient to trigger an Auction (See Bidding Procedures, at ¶ 3-4);

(d)     the procedures for conducting the Auction, if any (See Bidding Procedures, at ¶ 7);

(e)     the criteria by which the Successful Bidder will be selected by the Debtors (See Bidding Procedures, at ¶ 8); and

(f)     various other matters relating to the Sale process generally, including regarding the Sale Hearing, requirements for credit bids, designation of a Back-Up Bidder, payment of the Bid Protections if any are due, return of any Good Faith Deposits and certain reservations of rights (See Bidding Procedures, at ¶¶ 9-11).

26.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates in consultation with key parties set forth herein. Moreover, the Debtors are seeking authority to employ an investment banker in order to ensure that the Debtors' assets continue to be marketed during the sales process such that other Potential Bidders might become Qualified Bidders, thereby increasing the purchase price of the Sale.

### B.    Provisions to Be Highlighted Under the Local Rules

27.    The Bidding Procedures contain the following provisions that are to be highlighted pursuant to Local Rule 6004-1(c), which are more fully described in the Bidding Procedures and the proposed Bid Procedures Order:[9]

| | |
|---|---|
| **Provisions Governing Qualification of Bidders**<br><br>**(see Bid Procedures ¶ 3-4)** | In order to be a Qualified Bidder, a bidder must deliver the Qualified Bid Required Documents by the Bid Deadline.  The Qualified Bid Required Documents include:<br><br>(a) a letter (i) setting forth the net cash purchase price, equal to or greater than the sum of (A) $13,000,000 plus (B) the Qualifying Fees and Reimbursements, if any, plus (C) $250,000; and (ii) stating the assumed liabilities proposed to be paid or assumed by such bidder for the Acquired Assets; (iii) stating that the bid submitted by such bidder is irrevocable until the conclusion of the Sale Hearing, subject to the requirements relating to any Back-up Bidder; (iv) stating that such bid and related documents submitted have been duly authorized, executed, and delivered by such bidder and that no further internal or equity holder approvals are required with respect to any such agreement or matter; (v) setting forth each regulatory and other approval required and the time period for receipt of same; (vi) including a commitment to close on or before May 27, 2015 (the "Projected Closing Date"); and (vii) confirming that the bid is not conditioned on receipt of any financing, the outcome of any due diligence investigation regarding the Acquired Assets other than as may be included in the APA, or receipt of any internal or equity holder approval of any sort;<br><br>(b) a clean asset purchase agreement for the Acquired Assets consistent in all material respects with clause (a) above, together with all exhibits and schedules thereto, which contains substantially the same terms as the APA (together with such additional terms as are required herein), or terms more favorable to the Debtors than the terms set forth in the APA (a "Modified Purchase Agreement"), and a marked Modified Purchase Agreement reflecting the variations from the APA and each exhibit and schedule thereto, as applicable;<br><br>(c) (i) recent financial information, showing such bidder's ability to pay the cash portion of the purchase price under the Modified Purchase Agreement, |

---

[9]    All hearing dates and objection deadlines set forth in this section are subject to the Court's availability.  A notice with the confirmed dates and time of such hearings and objection deadlines will be separately filed.

| | |
|---|---|
| | and/or (ii) copies of written and legally binding firm commitments to provide required financing executed by all parties thereto, satisfactory to the Debtors and containing no material conditions to the closing and funding of such financing and other than entry of the Sale Order and receipt of required government consents or approvals, and (iii) a combination of the materials and information described in (i) and (ii) of this clause (c) above, satisfactory to the Debtors, after consultation with the Agents, evidencing a capitalization for such bidder equal to or greater than that proposed to be established by the Purchaser;<br><br>(d) the Modified Purchase Agreement must exclude from Acquired Assets any and all (i) claims and causes of action of the Debtors against any Agent or any Lender and (ii) cash and cash equivalents owned by any Debtor in any form; and<br><br>(e) a cash deposit in the amount of $1,000,000. |
| **Provisions Governing Qualified Bids**<br><br>**(see Bid Procedures 5)** | Debtors shall determine, after consultation with the Agents and the Creditors' Committee, which of the Qualified Bids or other bids is likely to result in the highest or otherwise best offer for the Acquired Assets (the bid so selected, being referred to herein as the "Starting Bid"), based on numerous factors, including the net value, recovery, and the amount and availability of distributions to the Debtors, their creditors, and equity holders as a result of the proposed transaction; the assets and liabilities included or excluded from the bid (and the resulting effect on value and distributions); the number, type, and nature of any changes to the APA requested by each bidder; the financial viability of the proposed purchaser; whether such bid makes a request for any Qualifying Fees and Reimbursements and the aggregate amount thereof; and the certainty and timing of closing the transactions contemplated in each Qualified Bid. |
| **Provisions Providing Bid Protections to the Stalking Horse Bidder** | No Qualified Fees or Reimbursements to be provided to the Buyer if the Senior Agent serves as the Stalking Horse Bidder.<br><br>Requirement of minimum cash deposit of $1 million from any competing bidder; requirement of minimum of $250,000 overbid, plus the amount of any Qualifying Fees or Reimbursements (if such are awarded to some other purchaser interested in and selected to be the Stalking Horse Bidder.<br><br>No Qualified Bid Required Documents shall entitle the bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, but each Qualified Bidder must set forth in its Qualified Bid Required Documents the terms of any Qualifying Fees and |

| | |
|---|---|
| | Reimbursements that such Qualified Bidder would request if its Qualified Bid were deemed to be the Starting Bid; provided, however, if the Debtors determine that any Qualified Bid other than the APA is the Starting Bid, then any such Qualified Bid may thereafter be amended to provide for a break-up fee, expense reimbursement, or similar type of fee or payment on terms acceptable to the Debtors, but in no event may any such fees or payments exceed $1,000,000 in the aggregate (any such qualifying fees or payments, if any, are referred to herein, collectively, as "Qualifying Fees and Reimbursements"). <br><br> All of the above are hereinafter referred to as the "Bidding Protections." |
| **Modification of Bidding and Auction Procedures** | The proposed Bid Procedures Order provides (¶ 21) that the Debtors reserve the right to amend any deadline set forth in the order without further Court approval; provided, however, that no such amendment will provide any interested party with less notice than provided for as such deadlines are currently set forth herein; provided, further, that the Debtors shall file a notice detailing any such changes with this Court and serve such notice in accordance with the Local Rules, including service upon any interested bidders. |
| **Closing with Alternative Back-up Bidders** | Any Back-up Bidder identified in accordance with ¶ 10 of the Bidding Procedures shall keep its bid open and irrevocable until the earlier of 5:00 p.m. prevailing Eastern Time on the earlier of the date which is thirty (30) days following the Sale Hearing or the closing of the Sale with the Buyer (the "Outside Back-up Date"); provided, that the Stalking Horse Purchaser shall not be required to serve as the Back-up Bidder. Following the Sale Hearing, if the Buyer approved as such in the Sale Hearing fails to consummate an approved Sale because of a breach or failure to perform on the part of such Buyer, the Back-up Bidder, if any, will be deemed to be the new Successful Bidder, and the Back-up Bidder's Qualifying Bid, as updated through the conclusion of the Auction and the Debtors determination of the Back-up Bidder, shall be deemed to be the new Successful Bid. |
| **Provisions Governing the Auction** | If the Debtors receive one or more timely Qualified Bids, the Debtors will conduct an Auction starting at May 19, 2015 at 10:00 a.m. (prevailing Eastern Time) at the offices of Debtors' counsel, Womble Carlyle Sandridge & Rice, LLP, 222 Delaware Ave., Suite 1501, Wilmington, Delaware 19801, or at such other place, date, and time as the Debtors may designate. Other than the Debtors and the Creditors' Committee, only (i) Purchaser and its advisors and (ii) parties and their advisors that have been advised that they have submitted or been deemed to have submitted a Qualified Bid will be permitted to participate as or with a bidder at the Auction. The Auction shall be governed |

by the following procedures:

(a) only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(b) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding, the Sale, or the Bidding Process;

(c) the Qualified Bidders shall appear at the Auction in person or through a duly authorized representative unless the Debtors otherwise agree in consultation with Agents and the Creditors' Committee;

(d) prior to the Auction, the Debtors shall provide copies of the Starting Bid to all Qualified Bidders that have informed the Debtors of their intent to participate in the Auction;

(e) Qualified Bidders may then submit successive bids with the value to the Debtors, as determined by the Debtors in their reasonable business judgment after consultation with the Agents and Creditors' Committee, of at least the Starting Bid plus (A) in the event that a Starting Bid contains Qualifying Fees or Reimbursements, cash equal to the aggregate amount of any such Qualifying Fees or Reimbursements, plus (B) $250,000, and then continue in minimum increments of value of at least $100,000 higher than the previous bid; provided, that the Debtors will retain the right to modify the bid increment requirements (other than the initial bid increment of $250,000) at the Auction after consultation with the Agents and the Creditors' Committee.

(f) the Auction will be conducted in a manner as determined by the Debtors in consultation with the Agents and the Creditors' Committee; provided, however, that unless otherwise agreed to in writing by the Purchaser, the bids that the Debtors determine to be topping bids pursuant to clause (e) above shall be stated on the record at the Auction;

(g) all Qualified Bidders shall have the right to submit additional bids and make additional modifications to their respective Modified Purchase Agreement at the Auction; provided, that any such modifications to the Modified Purchase Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than any prior bid by such party or the preceding bid, as determined by the Debtors in consultation with Agents; provided, further, that such additional bids must comply with all of the conditions for a Qualified Bid set forth in Section 3 above.

(h) the Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, as further amended during the Auction process, and any further information that Debtors believe are reasonably necessary to clarify and evaluate the terms of a Qualified Bidder's bid;

(i) the Debtors shall announce the material terms of each Qualified Bidder's bid and the basis for calculating, and the total consideration offered in, each such bid; and

26

| | (j) prior to the Auction, the Debtors shall notify potential bidders of the Projected Closing Date set forth in the Starting Bid. For each day following the Projected Closing Date set forth in the Successful Bid to, and including, the date that the Successful Bidder consummates the Sale, such Successful Bidder shall pay for the liabilities accruing during such period on account of such delay that would otherwise constitute chapter 11 administrative expenses. |
| --- | --- |

C.      **Summary of the Assumption Procedures**

28.      The Debtors are also seeking approval of certain procedures to facilitate

the fair and orderly assumption and assignment of the Assigned Contracts in connection

with the Sale (the "Assumption Procedures"). The Assumption Procedures are set forth

below:

(a)      **Notices for Assigned Agreements**. As soon as practicable following the entry of the Bid Procedures Order, the Debtors shall serve on all non-Debtor counterparties to any Contract (the "Contract Notice Parties") that may be assumed by the Debtors and assigned to a Successful Bidder, an "Assumption and Assignment Notice" in the form attached to the Bid Procedures Order as Exhibit 3 that identifies, to the extent applicable (a) the Contract that may be an Assigned Contract; (b) the name of the counterparty to such Contract; (c) any applicable cure amount for such Contract if it becomes an Assigned Contract; and (d) the deadline by which any Contract counterparty must file a "Contract Objection" to the proposed assumption and assignment; provided, however, that the presence of a Contract on a Contract Notice does not constitute an admission that such Contract is an executory contract. No later than one day prior to the Sale Hearing, the Debtors shall file and serve an assumption and assignment notice on the applicable non-debtor counterparty to the executory contract and unexpired leases that have been determined to be either Assigned Contracts or Rejected Contracts (as defined in the Bid Procedures Order, collectively, the "Rejected Contracts").

(b)      **Objections to Assumption and Assignment of Contracts**. For all non-Debtor counterparties to an Assigned Contract served an Assumption and Assignment Notice in accordance with this Order more than 14 days prior to the Sale Hearing, to which no Contract Objection was timely filed within 14 days after mailing of the

Contract Notice, the counterparty to such Assigned Contract shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Contract assignment and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order.  For all non-Debtor counterparties to an Assigned Contract served with a Contract Notice 14 days or less prior to the Sale Hearing, if a timely filed Contract Objection is not received at or prior to the Sale Hearing, the counterparty to such Assigned Contract shall be deemed to have waived and released any right to assert an objection to the assignment and assumption of such Assigned Contract and to have otherwise consented to such assumption and assignment and cure amount, and the assignment will be deemed effective in accordance with the Sale Order.  If any counterparty timely files a Contract Objection that cannot be resolved by the Debtors and the counterparty, the Court shall resolve such Contract Objection prior to the assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assumption and assignment shall be deemed effective in accordance with the Sale Order.

29.    Any party failing to timely file an objection to the assumption and assignment of any contract or lease or related cure amount specified on an Assumption and Assignment Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Stalking Horse Bidder, or other Successful Bidder with respect to such executory contract(s) or unexpired lease(s) and shall be deemed to consent to the Sale and the assumption and assignment of such executory contract(s) or unexpired lease(s) effectuated in connection therewith.

## VIII.    Supporting Authority

### A.    The Relief Sought in the Bid Procedures Order is in the Bests Interests of the Debtors' Estates and Should be Approved

30.    The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the estate.  See, e.g., In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession has fiduciary duty to protect and maximize the estate's assets); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3rd Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, a primary objective of the Code [is] to enhance the value of the estate at hand).

31.    Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  See In re Fin. News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) (court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of bankrupt estates[]); In re O'Brien Entl. Energy, 181 F.3d at 537; Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures encourage bidding and maximize the value of the debtor's assets); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (purpose of procedural bidding orders is to facilitate open and fair public sale designed to maximize value for estate).

29

32.     The Debtors believe that the proposed Bidding Procedures will establish the parameters under which the value of the Acquired Assets may be tested at the Auction and approved at the Sale Hearing. The Bidding Procedures will increase the likelihood that the Debtors receive the most consideration for the Acquired Assets because they encourage competitive and fair bidding. The Bidding Procedures will also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maximizing the value to their estates and overall enterprise.

33.     Specifically, the proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bidding Procedures will encourage active bidding from interested parties and thus dispel any doubts as to the highest or best offer available for the Acquired Assets. The Bidding Procedures are consistent with other procedures previously approved by this Court, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See In re O'Brien Envtl. Energy, 181 F.3d at 537; In re Palm Harbor Homes, Inc., Case No. 10-13850 (Bankr. D. Del. Jan. 6, 2011) [Docket No. 187]; In re Ultimate Escapes Holdings, LLC, Case No. 10-12915 (Bankr. D. Del. Oct. 8, 2010) [Docket No. 133]; In re PTC Alliance Corp., Case No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) [Docket No. 226]; In re Hayes Lemmerz Intl, Inc., Case No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) [Docket No. 644]; In re VeraSun Energy Corp., Case No. 08-12606

(Bankr. D. Del. Feb. 19, 2009) [Docket No. 699]; In re Hines Horticulture, Inc., Case No. 08-11922 (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355].[10]

**B.    The Bid Protections Have Sound Business Purpose and Should Be Approved.**

34.    At this time, the Debtors are not seeking permission to provide the Buyer with traditional bid protections such as a break-up fee or expense reimbursement.  That said, the Bidding Procedures do provide that if another party other than the Buyer provides the Starting Bid, such party may be entitled to Qualifying Fees and Reimbursements, which in the aggregate may not exceed $1 million.  The Bidding Procedures also provide that any overbid after the Starting Bid (as defined in the Bidding Procedures) must be made in increments of at least $250,000 for the initial overbid and then each successive bid must be in minimum increments of at least $100,000 than the prior bid; provided, however, the Debtors will retain the right to modify the bid increment requirements (other than the initial bid increment of $250,000) at the Auction after consultation with the Senior Agents and the Creditors' Committee.  To the extent some other entity provides the Starting Bid, the  first overbid over the Starting Bid must be the sum of the awarded Qualified Fees and Reimbursements plus $250,000.

35.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or public auction.  The Debtors believe that having the ability to offer the Qualified Fees and Reimbursements (as outlined in the Bidding Procedures) to any entity other than the Buyer  that wishes to

---

[10]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request to the Debtors' counsel.

provide the Starting Bid (as thus be the stalking horse) will likely maximize the realizable value of the Acquired Assets for the benefit of the Debtors' estates, creditors, and other parties-in-interest.

36.    Approval of the Bidding Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding, would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.; see also In re Reliant Energy Channel View LP, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

37.    In O'Brien, the court reviewed nine factors as relevant in deciding whether to award a break-up fee as follows: (i) the presence of self-dealing or manipulation in negotiating the break-up fee; (ii) whether the fee harms, rather than encourages, bidding; (iii) the reasonableness of the break-up fee relative to the purchase price; (iv) whether the

unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction; (v) the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (vi) the correlation of the fee to a maximization of value of the debtor's estate; (vii) the support of the principal secured creditors and creditors' committees of the break-up fee; (viii) the benefits of the safeguards to the debtor's estate; and (ix) the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee. See O'Brien, 181 F.3d at 536.

38.    The Bid Protections set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Acquired Assets and, thus, insist that competing bids be materially higher or otherwise better than the APA and attracts other potential buyers to bid for all of the Acquired Assets subject to the APA – a clear benefit to the Debtors' estates.  Indeed, the present Stalking Horse Bidder has agreed not to pursue such traditional bid protections as a break-up fee or expense reimbursement. Moreover, the Buyer would not agree to act as a stalking horse without the Bid Protections that are being requested, and there has been no showing of any self-dealing or manipulation in the negotiation of the Bid Protections.  Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or best offer for the Acquired Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  Furthermore, without the benefit of the Stalking

Horse Bidder, the bids received at the Auction for the Acquired Assets could be substantially lower than the Stalking Horse Bid.

39.    To the extent that Qualifying Fees and Reimbursements are awarded to a different Qualified Bidder seeking to be a stalking horse, this will not diminish the Debtors' estates. The Qualifying Fees and Reimbursements, if any, are only payable if a Sale to a bidder other than the Buyer is consummated, and the initial overbid over the Starting Bid under the Bidding Procedures includes the addition of the Qualifying Fees and Reimbursements, among other things, to what would constitute an acceptable Qualified Bid.

40.    To the extent that Qualifying Fees and Reimbursements are awarded, such amounts are capped at $1 million. The Debtors will ensure that any component that constitutes a traditional break-up fee is as low as possible to ensure compliance with what has been approved by courts in this district. Thereby, the Bid Protections will be comparable to bid protections approved by courts in this and other districts. See, e.g., In re NEC Holdings Corp., No. 10-11890 (PJW) (Bankr D. Del. July 30, 2010) (approving break-up fee and expense reimbursement of approximately 3.5% of stalking horse purchase price); In re Global Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (approving break-up fee of approximately 4% of the sale price).[11]

41.    Accordingly, the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because standard used by courts in this

---

[11]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

district in approving similar protections has been satisfied, the Debtors respectfully request that the Bid Protections be approved.

### C. The Assumption Procedures Are Appropriate and Should Be Approved.

42.     In connection with the assumption and assignment of the Assigned Contracts, the Debtors believe it is necessary to establish a process by which (i) the Debtors and counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with Bankruptcy Code section 363, and (ii) such counterparties can object to the assumption and assignment of Assigned Contracts and/or related cure amounts (collectively, the "Assumption Procedures").  All of the above are hereinafter referred to as the "Bidding Protections."

43.     As set forth in the Bid Procedures Order, the Debtors are also requesting that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to Bankruptcy Code section 365 on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment. See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

44.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the non-debtor parties to the Assigned Contracts, and provide certainty to all parties in interest regarding their obligations and rights in

respect thereof. Accordingly, the Debtors request that the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

### D.    The Form and Manner of the Sale Notice Should Be Approved.

45.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

46.    Within three (3) business days after entry of the Bid Procedures Order or as soon thereafter as practicable, the Debtors will serve the Sale Notice upon the following parties: (a) the United States Trustee for the District of Delaware; (b) the members of and counsel to any official committee appointed in these cases; (c) the Lender; (d) attorneys general for each of the States in which the Debtors conduct operations; (e) all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (f) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (g) any parties that have expressed interest in acquiring all or substantial portion of the Acquired Assets; (h) parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets; (i) all governmental agencies that is an interested party with respect to the Sale and transactions proposed thereunder; (j) all non-Debtor counterparties to the Assigned Contracts and Rejected Contracts; and (k) all other known creditors of the Debtors.

47.    Additionally, within five (5) business days after entry of the Bid Procedures Order or as soon thereafter as practicable, the Debtors will publish the Sale

Notice once in the Wall Street Journal or such other publication recommended by the Debtors' investment banker retained by the Debtors and approved by the Court.

48.    The notice of this Motion and the related hearing to consider entry of the Bid Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 2002-1. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

### E.    The Sale Order Should Be Entered on the Terms Proposed.

49.    Bankruptcy Code section 363 provides that a debtor, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. 11 U.S.C. § 363(b). It is well-established in this jurisdiction that a debtor may sell assets outside of a plan of reorganization pursuant to Bankruptcy Code section 363(b) if there is a good business reason for doing so. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3rd Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (Bankr. D. Del. 1991); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

50.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and

(d) whether the parties have acted in good faith.  See In re Delaware & Hudson Ry., 124

B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); In re

United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13–14 and

n.2 (D.N.J. Mar. 26, 1997).  The Delaware & Hudson Railway court further held that:

> [O]nce a court is satisfied that there is a sound business reason or an
> emergency justifying the pre-confirmation sale, the court must also
> determine that the trustee has provided the interested parties with adequate
> and reasonable notice, that the sale price is fair and reasonable and that the
> or [proposed] purchaser is proceeding in good faith.

In re Delaware & Hudson Ry., 124 B.R. at 176.

51.    A sound business purpose for the sale of a debtor's assets outside the

ordinary course of business may be found where such a sale is necessary to preserve the

value of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts

Dairies of Penn., Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063

(2nd Cir. 1983).  In fact, the paramount goal in any proposed sale of property of the estate

is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores,

Inc., 107 F.3d 558, 564-65 (8th Cir. 1997); In re Integrated Res., 147 B.R. at 659.

52.    Furthermore, once the debtor articulates a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct.  Committee of Asbestos-

Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),

60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that in making a

business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company.  In

re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

53.    The Sale is appropriate because it will preserve the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. The Postpetition Senior Lenders have only offered debtor-in-possession financing for a ten week period. Failure to approve the Bidding Procedures could impact the viability of the Debtors' ability to function any longer than the proposed ten week period and jeopardize the ability of the Debtors' to sell their assets on a going concern basis. Further, the Buyer (or its nominee), has agreed to a process that provides more than adequate time for the marketing of the Sale and ensure that all interested parties are afforded an opportunity to participate in the process. Moreover, the Buyer has forgone traditional bidding protections such as an expense reimbursement or break-up fee to incent participation in this process. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Code section 363(b) to proceed with the Sale and should be permitted to proceed with the Sale contemplated by the Bidding Procedures.

54.     Bankruptcy Code section 365(a) provides, in relevant part, that a debtor in possession may, subject to the court's approval, "assume . . . any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, including the requirement that a debtor cure all defaults in an executory contract or unexpired lease. 11 U.S.C. § 365(b)(1).

55.     The Third Circuit applies the business judgment test, which requires a debtor to determine whether a requested assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code would be beneficial to its estate. See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3rd Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code.") (quoting In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 891, 898 (Bankr. E.D. Pa. 1987)); In re III Enterprises, Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

56.     The court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its business judgment. See In re Decora Industries, Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) (the standard for approving the assumption of an executory contract is the business judgment rule.); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D.

Del. 2006) (the propriety of a decision to reject an executory contract is governed by the business judgment standard.).

57.   To determine if the business judgment test is met, the court is required to examine whether a reasonable business person would make a similar decision under similar circumstances. In re Exide Techs., 340 B.R. at 239 ("[t]his is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions Corp., 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985). In this case, and as will be demonstrated at the Sale Hearing, if necessary, the Debtors' decision to assume and assign the Assigned Contracts pursuant to the terms of the APA and pursuant to the assumption procedures as delineated in the Sale Order (collectively, the "Assumption Procedures") will satisfy the requirements of the Bankruptcy Code and is supported by the Debtors' reasonable business judgment.

58.   Conversely, rejection of the Assigned Contracts would in many cases result in rejection damage claims against the Debtors. Moreover, the Assigned Contracts will be necessary for the Buyer to conduct the businesses and, since it is unlikely that a purchaser would pay full value for the Acquired Contracts without the benefit of the

Assigned Contracts, the assumption and assignment of the executory contracts and unexpired leases related to the Debtors' businesses will be essential to inducing the highest or otherwise best offer for the Acquired Assets.

59.     Further, by assuming and assigning the Assigned Contracts, the Debtors will achieve the positive result of eliminating the Debtors' future performance obligations and, at the same time, avoid the incurrence of rejection damage claims. See 11 U.S.C. § 365(k) ("Assignment by the [debtor] to an entity of a . . . lease assumed under [section 365] relieves [the debtor] from any liability for any breach of such contract or lease occurring after such assignment."). Because the Debtors cannot otherwise obtain the benefits of the APA, the assumption and assignment of the Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment. Finally, by way of the competitive bidding process promulgated under the Bidding Procedures, the Sale will maximize the value of the Assigned Contracts for the Debtors' estates. Accordingly, to the extent that the Debtors can sell any related executory contracts and unexpired leases in connection with entry into the APA, they may be able generate cash to the benefit of their estates.

60.     To the extent the Assigned Contracts are assumed by the Debtors and assigned to the Buyer, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of such Assigned Contracts will be satisfied at the Sale Hearing. As described in the Bidding Procedures, the Debtors require bidders to declare the willingness and financial ability to perform under the Assigned Contracts in order to be considered as Qualified Bidders. Specifically, the Debtors will consider the

financial credibility, willingness and ability of the Bidder to perform under the Assigned

Contract.  Moreover, counterparties will have adequate time and opportunity to object to

the assumption or proposed cure amount of any such Assigned Contract.

     **F.**     **Assignment of the Assumed Agreements is Appropriate
Notwithstanding Any Anti-Assignment Provisions in Such Contracts**

     61.     To assist in the assumption and assignment of the Assigned Contracts, the

Debtors also request that the Sale Order provide that certain anti-assignment provisions in

the Assigned Contracts not restrict, limit or prohibit the assumption, assignment and sale

of the Assumed Agreements and that such provisions are deemed and found to be

unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

     62.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease
> of the debtor, or in applicable law, that prohibits, restricts, or conditions
> the assignment of such contract or lease, the trustee may assign such
> contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

     63.     Section 365(f)(l) of the Bankruptcy Code thus invalidates provisions that

prohibit, restrict, or condition assignment of an executory contract or unexpired lease.

See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F.

3d 904, 910–11 (9th Cir. 1997) ("[n]o principle of bankruptcy or contract law precludes

us from permitting the Debtors here to extend their leases in a manner contrary to the

leases' terms, when to do so will effectuate the purposes of section 365.").  Section

365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the

Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.

64.     Accordingly, the Debtors request that any anti-assignment provision in an Assigned Contracts be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### G.    The Sale and Purchase Price Reflects a Fair Value Transaction

65.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship, 526 U.S. 434, 457 (1999); see also In re Trans World Airlines, Inc., No. 01-0056, 2001 Bankr. Lexis 980, at *13 (Bankr. D. Del. April 2, 2001) ("the auction procedure has developed over the years as an effective means for producing an arms' length fair value transaction").  This is especially true here, where the proposed sale of the Acquired Assets has been subject to extensive marketing, which commenced many months prior to the Petition Date.

66.     Moreover, even as the Debtors move forward with the Sale, after entry of the Bid Procedures Order, the Debtors' investment banker will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the APA.  Accordingly, the number of bidders that are eligible to participate in the competitive auction will be maximized, or if no Auction is held

because no Auction is necessary, the APA purchase price will, conclusively, be fair value.

### H. The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a Good Faith Purchaser.

67.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" In re Abbotts Dairies, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).

68.     A party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involved fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

69.     The Debtors submit that the Buyer, or other Successful Bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m) and the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of

Bankruptcy Code section 363(m). First, the consideration to be received by the Debtors pursuant to the APA is substantial, fair, and reasonable. Second, the parties have negotiated the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel. Third, there is no indication of any fraud, collusion between the purchaser and other bidders or the Debtors, or any attempt to take grossly unfair advantage of other bidders or similar conduct that would cause or permit the Sale or APA to be avoided under Bankruptcy Code section 363(m). Additionally, the Stalking Horse Bidder's offer was evaluation and approved by the Debtors' management, in consultation with the Debtors' professionals. Finally, and most importantly, the Senior Lenders, recognizing that their status as the Buyer could draw unwarranted criticism, have agreed to 1) accept a reasonable marketing and sales process, 2) foregone traditional benefits afforded to a stalking-horse bidder such as break-up fees and reimbursement expenses and 3) provide a carveout to the Debtors' investment banker to incentivize the sales and marketing process. The Senior Lenders have made these accommodations to ensure that the Auction may produce as many potential other bidders to the process and result in the highest and best offer possible that maximizes the value of the Debtors' assets. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder) and the APA (or marked APA) should be entitled to the full protections of Bankruptcy Code section 363(m).

I.    **The Sale of the Assets Free and Clear of Liens is Authorized by Section 363(f)**

70.    The Debtors further submit that it is appropriate to sell the Acquired Assets free and clear of all Liens (other than any assumed liabilities that the Purchaser

agrees to assume in connection with the Sale as will be further described in the APA)

pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the

net sale proceeds of the Acquired Assets, as and to the extent applicable.  Section 363(f)

of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims,

interests and encumbrances if:

> (a)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (b)    such entity consents;
>
> (c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d)    such interest is in bona fide dispute; or
>
> (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

71.    This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C.

§105(a).[12]

72.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the

Acquired Assets "free and clear" of liens and interests.  See In re Thompson Publishing

---

[12]    Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that Bankruptcy Code section 105(a) of the Bankruptcy Code provides such authority.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

Holding Co., Inc., Case No. 10-13070 (Bankr. D. Del. Nov. 19, 2010) [Docket No. 178]

("[t]he [d]ebtors may sell the [p]urchased [a]ssets free and clear of all [l]iens of any kind

or nature whatsoever" as long as one or more of the standards set forth in section 363(f)

of the Bankruptcy Code has been satisfied.); In re Advanta Corp., Case No. 09-13931

(Bankr. D. Del. June 1, 2010) [Docket No. 602] ("[P]ursuant to section 363(f) of the

Bankruptcy Code, the [s]ale shall be free and clear of any and all liens, claims and

encumbrances against the [a]ssets, with such liens, claims and encumbrances, if any, to

attach to the proceeds of the [s]ale with the same force, effect and priority as such liens,

claims and encumbrances have on the [a]ssets..."); In re Aegis Mortgage Corp., Case No.

07-11119 (Bankr. D. Del. Aug. 17, 2010) [Docket No. 5447] (same); In re Foamex Int'l

Inc., Case No. 09-10560 (Bankr. D. Del. May 27, 2009) [Docket No. 483] ([t]he

[p]urchaser would not have entered into the [f]inal APA . . . if the sale of the [p]urchased

[a]ssets . . . were not free and clear of all [l]iens and [c]laims . . .); In re Dundee Equity

Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection

363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if

any one of the conditions of § 363(f) have been met."); Citicorp Homeowners Servs., Inc.

v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1998) (same); Michigan Employment

Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147

n.24 (6th Cir. 1991) (holding that the court may approve the sale free and clear provided

at least one of the subsections of Bankruptcy Code section 363(f) is met).

   73.  Here, to the extent the Sale is implemented, the Debtors will demonstrate

at the Sale Hearing (to the extent necessary) that one or more of the tests of section 363(f)

are satisfied with respect to the Sale. In the first instance, the Debtors have no reason to believe that holders of Liens would not consent to the terms of the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, the Debtors believe that all holders of Liens could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code, to the extent that such interests are sought to be discharged in the order approving the relief sought in this motion. Accordingly, the Debtors submit that any Liens will attach to the net proceeds (if any) recognized at the Sale.

74.     Based upon the foregoing, the Debtors submit that the Sale, free and clear of Liens, should be approved by the Court upon the terms requested at the Sale Hearing under section 363(f) of the Bankruptcy Code.

75.     As provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, Debtors respectfully request that the Sale Order not be stayed for 14 days after the entry of the Sale Order and thereby become effective immediately upon entry, and the Debtors and the Buyer be authorized to close the Sale immediately upon entry of the Sale Order.

## IX.     Notice

76.     Notice of this Motion shall be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (iii) the Internal Revenue Service; (iv) all taxing authorities that have, or may, assert claims against the Debtors or any of the Acquired Assets; (v) all contract and lease counterparties; (vi) counsel for the Purchaser;

(vii) all parties who are known or reasonably believed to have asserted any lien, encumbrance, claim or other interest in the Acquired Assets; (viii) all parties known or reasonably believed to have expressed an interest in the Acquired Assets; (ix) all parties to any pension plan maintained, sponsored, or contributed to by any Debtor; (x) all other creditors of the Debtors (whether liquidated, contingent, or unmatured); (xi) all parties to any governmental approvals or permits; (xii) any applicable state environmental agency; (xiii) the DIP Lender; and (xiv) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

## X.    No Prior Request

77.    No previous motion for the relief sought herein has been made to this or any other court.

## XI.    Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter the Bid Procedures Order and the Sale Order, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, granting the applicable relief requested herein, and granting such further relief as is just and proper.

Dated:  March 30, 2015

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Steven K. Kortanek
Steven K. Kortanek (Del. Bar No. 3106)
Thomas M. Horan (Del. Bar No. 4641)
Ericka F. Johnson (Del. Bar No. 5024)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail:  skortanek@wcsr.com
E-mail:  thoran@wcsr.com
E-mail:  erjohnson@wcsr.com
E-mail:  mpatterson@wcsr.com

-and-

**BURNS & LEVINSON LLP**
Scott H. Moskol
William V. Sopp
Michael V. Samarel
Tal M. Unrad
125 Summer Street
Boston, MA 02110
Telephone: (617) 345-3522
Facsimile: (617) 345-3299
E-mail:  smoskol@burnslev.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*