**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>KARMALOOP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-10635 (MFW)<br><br>(Jointly Administered)<br><br>RE: Docket Nos.: 71 and 143 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION
TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
AND AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES
AND GRANTING RELATED RELIEF AND (II) LIEN CHALLENGE**

The Official Committee of Unsecured Creditors (the "Committee") of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or "Sellers"), by and through their counsel, hereby submits this: (i) objection (the "Sale Objection") to the *Debtors' Motion for Entry of (I) an Order Approving and Authorizing (A) Bidding Procedures in Connection with the Sale of the Debtors' Assets; (B) the Form and Manner of Notice of the Sale Hearing and (C) Related Relief; and (II) an Order Authorizing (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances, (B) the Debtors to Enter into and Perform their Obligations under the Asset Purchase Agreement; (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (D) Granting Related Relief* [D.I. 71] (the "Sale Motion");[2] and (ii) challenge to Lenders' liens (the "Lien Challenge") with respect to the Unencumbered Prepetition Assets (defined below). In support hereof, the Committee respectfully represents as follows:

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Karmaloop, Inc. - 3934; KarmaloopTV, Inc. – 8230. The Debtors' address is 334 Boylston Street, Suite 500, Boston, MA 02116.

[2] Capitalized terms used, but not defined, shall have the meaning ascribed to them in the Sale Motion or DIP Motion (defined below).

# PRELIMINARY STATEMENT

1.  Comvest Capital II, L.P. ("Comvest" or "Lenders") retains several critical roles in these cases, such as serving as the agent for both the Prepetition Lenders and the Postpetition Lenders, in addition to also serving as a Postpetition Lender.[3] Its various positions within the Debtors' financial structure enabled Comvest considerable influence in these cases. It forced the Debtors to enter into a stalking horse agreement on an expedited basis while simultaneously threatening to reduce their liquidity by limiting their ability to borrow funds under the prepetition credit facility and denying use of cash collateral.

2.  In addition, the Lenders maintain critical veto-rights over the Debtors' sale process on account of their decision to credit bid only $13 million of an approximately $30 million loan. Moreover, despite repeated requests by the Committee, the Lenders have refused to disclose their upset price and maintain the right to increase their bid at auction up to the full amount of their claim.

3.  The proposed Sale to the Lenders cannot be approved in a vacuum. The Court and Debtors' constituents must know, with reasonable certainty, what value will be provided to the unsecured creditor class before the Sale is approved, not after. The Lenders must not be permitted to liquidate their collateral in a chapter 11 process without being required to make a commitment to fund a confirmable and feasible plan that provides for payment of administrative expenses and priority claims along with providing a reasonable return to holders of unsecured claims.

4.  As noted at the outset of these cases in the Committee's objections to the Bid Procedures and DIP Motion [D.I. 123 and D.I. 122, respectively], the Committee is concerned that the current form of Purchase Agreement, which, for example, provides that the Lenders will receive the benefit of nearly all of the estates' causes of action, including those under Chapter 5

---

[3] *See Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [D.I. 11] (the "DIP Motion") at ¶ 21(c).

of the Bankruptcy Code, for no consideration. These claims should inure for the sole benefit of unsecured creditors.

5. Should the Court approve the Sale, the Committee urges the Court to condition such approval upon all Sale proceeds being held in escrow.

6. First, the Committee understands that the Lenders do not hold a valid lien on the Unencumbered Prepetition Assets (defined below). As such, the Lenders are not entitled to credit bid on the Unencumbered Prepetition Assets. If the Lenders or their affiliates are the successful bidders at the Sale, a valuation of the Unencumbered Prepetition Assets must be completed immediately and the purchase price must be supplemented in cash by this amount.

7. Second, it is also unclear whether the estates' administrative expense claims will be paid in full in these cases. At a minimum, Sale proceeds must be held in escrow pending a determination that the estates have sufficient cash to: (i) satisfy all administrative expenses and priority claims as part of a chapter 11 plan; (ii) fund a plan process and the expenses that will accrue by the estates during the post confirmation wind-down period; and (iii) provide for a confirmable and feasible distribution to holders of unsecured claims.

## BACKGROUND

8. On March 23, 2015, (the "Petition Date"), each of the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

9. The Debtors' cases are being jointly administered for procedural purposes only, pursuant to an order of the Court entered on March 25, 2015 [D.I. 40].

10. Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

11. On April 1, 2015 (the "Formation Date"), the Office of the United States Trustee for this District appointed the Committee.

12. On April 17, 2015, the *Final Order Authorizing Debtors to: (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide*

*Security and Other Relief to Comvest Capital II, L.P., as Agent and the Lenders* [D.I. 143] (the "Final DIP Order") was entered.

13. On April 21, 2015, the *Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases and (II) Cure Amounts* was filed [D.I. 150] ("Cure Notice").

### A. Summary of Sale Motion

14. On March 30, 2015, the Debtors filed the Sale Motion to seek authority to sell their assets and enter into an asset purchase agreement (the "APA"). *See* Sale Motion at ¶ 9. The Debtors selected the Lenders or their successors, assigns, and/or designee (the "Purchaser") to serve as the stalking horse bidder for the Sale. *Id.* at 2.

15. The Sale Motion provides that the Purchase Price for the Acquired Assets will consist of a "$13 million credit bid to be charged against the Senior Facilities and first lien position on all of the Acquired Assets under the Senior Facilities plus the assumption at the Closing of the Assumed Liabilities from the Seller, plus any Cure Amounts required to be paid by Buyer in accordance with the terms hereof." *Id.* at ¶ 18 (Consideration). Based upon the Cure Notice, the estimated sum of the "Cure Amount" is $9.18 million.

16. The *Order (A) Approving Bid Procedures and Bid Protections Relating to Sale of Substantially all of the Debtors' Assets; (B) Scheduling an Auction and Hearing; (C) Approving Form and Manner of Notice of Sale and Auction; and (D) Establishing Procedures Relating to Assumption and Assignment and Rejection of Contracts* [D.I. 147] ("Bid Procedures Order") was entered on April 17, 2015. The following deadlines and dates were established in the Bid Procedures Order:

(a) May 14, 2015 at 4:00 p.m. as both the deadline to object to the Sale of Acquired Assets to the Purchaser ("Sale Objection Deadline") and the deadline to object to proposed Cure Amounts;

(b) May 20, 2015 at 5:00 p.m. as the deadline to submit a Qualified Bid ("Bid Deadline");

(c) May 21, 2015 at 12:30 p.m. as the date of the hearing to consider approval of the Sale ("Purchaser Sale Hearing") if only one Qualified Bid is received by the Bid Deadline;

(d) May 26, 2015 at 10:00 a.m. (the "Auction Date") for an auction to sell the Acquired Assets ("Auction") if more than one Qualified Bid is received by the Bid Deadline;

(e) May 28, 2015 at 2:00 p.m. ("Sale Hearing Date") as the date of the hearing to consider approval of the Sale ("Sale Hearing") if more than one Qualified Bid is received by the Bid Deadline; and

(f) June 3, 2015 as the projected closing date for the Sale.

*See* Bid Procedures Order at ¶¶ 7, 8, 10, and 13.

**B.    Summary of APA**

17.    The APA provides that a purchaser shall attain the Acquired Assets in two lots: Lot 1 and Lot 2, and assume responsibility for the "Assumed Liabilities." *See* APA at §§ 2.1, 2.3. The list of Acquired Assets includes a laundry list of items to be sold pursuant to the Sale. *See* APA at Art. I (definition of Acquired Assets). Specifically:

(a) all Insurance Policies other than the Seller's Directors and Officers Liability Policy [("Insurance Policies")];

(b) all rights of [the Debtors] under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees, directors, consultants, independent contracts and agents of [the Debtors] or with third parties to the extent relating to the Business [("Non-Compete Rights")];

(c) all litigation claims and causes of action [("Estate Causes of Action")] (including under chapter 5 of the Bankruptcy Code) [("Chapter 5 Causes of Action")] ... ; any rights against parties who have executed confidentiality agreements in favor of [the Debtors], to the extent such confidentiality protections directly or indirectly protect the Acquired Assets [("Confi Rights")]; all rights in and to Intellectual Property ... ; and

(d)  all other tangible and intangible assets, properties, rights and claims of the [Debtors] of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business or which relate to the Acquired Assets (in each case, other than the Excluded Assets) not otherwise described above [("Other Acquired Assets")].

18. The Acquired Assets to be included in Lot 1 is set forth in Schedule 1-1. *Id.* at Annex 1.

19. "Lot 2 shall include only the equity interests owned by Seller in [Karmaloop Europe] ... and any Acquired Assets that are specifically and solely used in the Business operated by [Karmaloop Europe] and its Subsidiaries." *Id.* Further, the "purchaser of Lot 2 shall take such Lot subject to the Lot 1 purchaser's ownership of the 'PLNDR' trademarks (although subject to the Trademark Agreement) and ability to operate under the PLNDR names outside of Europe." *Id.*

20. However, the APA does not allocate the Purchase Price by Acquired Asset, or even by lot number.

### C.  Lien Challenge

21. Pursuant to the Final DIP Order, the Committee undertook an investigation of the Lenders' alleged prepetition liens on the Debtors' assets. *See* Final DIP Order at ¶ 3(c). The Committee's investigation identified assets to which the Lenders do not have a properly perfected prepetition lien, namely: (a) a thirty-four percent (34%) of the Debtors' interest in the equity of Karmaloop Europe AG; and (b) the registered copyright "Karma Blend logo" (Registration No. VAu000478670) owned by Karmaloop, Inc. (collectively, the "Unencumbered Prepetition Assets").

22. To avoid incurring unnecessary costs to the estates, the Committee and the Lenders entered into the *Stipulation By and Among the Official Committee of Unsecured Creditors and Comvest Capital II, L.P., as Agent, Extending Certain Deadlines* dated May 5, 2015 ("Lien Challenge Stipulation"), which extended the Committee's investigation deadline by two weeks to May 19, 2015 (the "Unencumbered Asset Investigation Deadline"). On May 6, 2015, the *Order Approving Stipulation By and Among the Official Committee of Unsecured*

*Creditors and Comvest Capital II, L.P., as Agent, Extending Certain Deadlines* [D.I. 194] ("Lien Challenge Stipulation Order").  The Lien Challenge Stipulation is attached as an exhibit to the Lien Challenge Stipulation Order.

23. The value of the Unencumbered Prepetition Assets has yet to be determined. Nevertheless, this does not mean that these assets or general unsecured creditors' interests in these assets are valueless.  Quite the contrary, the European subsidiary and its interests and the Debtors' intellectual property have value to these estates.  This value should be provided to general unsecured creditors as it is not otherwise encumbered by secured creditors.

## SALE OBJECTION AND LIEN CHALLENGE[4]

### A.  The Sale Wrongly Benefits Only the Lenders and Must Be Denied.

24. Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Courts require a debtor to show that that a valid business justification exists for the sale of assets outside of the ordinary course of business. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also Comm. of Equity Sec. Holders v. The Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 243 (Bankr. S.D. W. Va. 1996); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re Indus. Valley Refrigeration. & Air Conditioning Supplies,* 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  In evaluating whether a sound business purpose justifies a sale under section 363(b), courts generally consider whether the parties negotiated and entered into the sale transaction in good faith and whether the price to be paid for the assets represents fair value. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986).  While there need not be a showing of an emergency situation for selling substantially all of a debtor's assets, "there must be some articulated justification" for such a sale "other than" appeasing a major creditor.  *Lionel*, 722 F.2d at 1070.

---

[4] The Committee understands that a challenge to the Lenders' liens on the Unencumbered Prepetition Assets is typically asserted by adversary proceeding pursuant to Bankruptcy Rule 7001.  In light of the pending Sale and various deadlines, the Committee is raising these concerns herein in the interest of time.  However, a further pleading will be filed with the Court setting forth these issues.

25. Moreover, courts have found that a section 363 sale is improper when the sole purpose is to liquidate assets for the benefit of a secured creditor. *See In re Encore Healthcare Assocs.,* 312 B.R. 52 (Bankr. W.D. Pa. 2004) (applying the *Lionel* standard and finding no business justification as sole purpose of the section 363 sale was to liquidate assets for benefit of secured creditors). For example, the *Fremont Battery* court found that no business reason justified a proposed 363 sale that, at best, benefited one creditor and did "not create proceeds which would inure to the benefit of the unsecured creditors." *In re Fremont Battery Co.*, 73 B.R. 277, 279 (Bankr. W.D. Ohio 1987). In the instant cases, no such justification exists for the Sale—aside from the obvious appeasement of the Lenders.

26. "A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by *all* creditors." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) (emphasis supplied). Accordingly, courts have declined to allow section 363 sales of substantially all of a debtor's assets where such sales would leave the debtor's estate with scant value that will only serve to frustrate a reorganization process. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir. 1983) (refusing to approve a section 363 sale where the transaction would deplete the estate of virtually all value and leave "little prospect or occasion for further reorganization.") A fundamental policy of bankruptcy law requires debtors in possession to have "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors" not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (citations omitted).

27. At its core, the Sale Motion amounts to a foreclosure sale in favor of the Lenders that is without any provision for payment of remaining estate claims. In order for creditors, other than the Lenders, to receive any benefit in these cases, the Purchase Price must include certain minimum recoveries and protections for unsecured creditors. However, as the Purchase Price is currently defined, there is insufficient value to satisfy even the Prepetition Lenders' prepetition claim. The proposed Sale clearly benefits only the Lenders. Moreover, the Sale

not only fails to provide for a distribution to unsecured creditors, but also triggers additional administrative and unsecured obligations for which there are no funds available in the estates to pay. These obligations include post-petition expenses for contracts and services used post-petition but are not accounted for in the Assumed Liabilities.

### B. The Secured Lenders May Not Credit Bid for Unencumbered Assets.

28. The Committee identified assets, the Unencumbered Prepetition Assets, in which Comvest does not have a properly perfected prepetition security interest. Accordingly, the Committee has determined that a portion of the Debtors' pre-petition assets are unencumbered by Comvest's alleged lien. As a result, the Lenders have no right to assert a credit bid on all of the Debtors' prepetition assets as the Unencumbered Prepetition Assets do not "secure" their claims. *See In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806, 807–08 (Bankr. E.D. Va. 2014) (stating that a "credit bid amount must be configured to prevent [the secured lender] from credit bidding its claim against assets such as the FCC licenses that are not within the scope of its collateral pool").

29. Permitting a credit bid on all of the Debtors' assets, including the Unencumbered Prepetition Assets, would provide a windfall to the Lenders at the expense of the Debtors' other creditors. *See In re Package Design & Supply Co.*, 217 B.R. 422, 427 (Bankr. W.D.N.Y. 1998) (recognizing that a lienor should not capitalize "where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming").

30. If the Lenders are permitted to credit bid any portion of their claims based on their alleged security interest in the Unencumbered Prepetition Assets, they must pay cash for them or exclude the Unencumbered Prepetition Assets altogether. According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless the Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent, and validity of the lien claim. Such an order may also prevent an action from being filed against the lender seeking avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling, or other

claims. Thus, the Committee requests that if the Lenders, or any other alleged secured lender of the Debtors, are allowed to credit bid, the Sale must exclude the Unencumbered Prepetition Assets and require a cash payment for those assets at fair market value.

31. Even if the Lenders assert that their liens on the Unencumbered Prepetition Assets are valid—that is not yet fully resolved—the Debtors' estates must be protected. *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (allowing bank to credit bid conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the liens were later avoided).

32. The Third Circuit has emphasized the import of "review by the creditors," equipped with "full information," in any prospective asset sale under section 363(b)(1) of the Bankruptcy Code. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that the "creditor body could suffer" if the review process is not fully informed). Unsurprisingly, there is "no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien." *Fisker Auto.*, 510 B.R. at 61; *Nat'l Bank of Commerce of El Dorado v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interest under [§ 363(k)] because the validity of its liens and security interests are unresolved.").

### C. The Sale Is a *Sub Rosa* Plan and Cannot Be Approved.

33. The APA is an impermissible *sub rosa* plan which is, of itself, sufficient reason to deny the Sale Motion. A transaction is an impermissible *sub rosa* plan if it disposes of all or substantially all of the debtor's assets without following the Bankruptcy Code's procedural protections in connection with the development and approval of a plan of reorganization, such that the sale itself is a de facto plan. The procedural protections provided to creditors under the Bankruptcy Code include, among other things, the right to receive a detailed disclosure statement from a debtor and the right to vote on the proposed plan. *See* 11 U.S.C. §§ 1121, 1125, 1126; Fed. R. Bankr. P. 3016.

34. The Bankruptcy Code's protections for creditors ensure that creditors are treated fairly. Accordingly, courts have rejected proposed post petition agreements between debtors and select creditors that have the effect of dictating material terms of a plan of reorganization without complying with the Bankruptcy Code's procedural requirements for plan confirmation. *In re Braniff Airways,* 700 F.2d at 935 ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *see also In re Swallen's, Inc.,* 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be."); *In re Decora Indus.*, 2002 WL 32332749 at *8 (D. Del. May 20, 2002) ("[T]he focus of 'sub rosa' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement.");[5] *In re Fremont Battery Co.*, 73 B.R. at 279 (citing *Braniff Airways*).

35. In *Braniff Airways,* the seminal case concerning *sub rosa* plans, the debtor sought approval of a settlement with certain of its secured and unsecured creditors that called for the debtor to sell aircraft, equipment, landing slots and airport terminal leases to a buyer in exchange for travel scrip, secured notes and a profit participation in the buyer's future operation. *Braniff Airways*, 700 F.2d at 939. The travel scrip could only be used by employees, shareholders and designated unsecured creditors. *Id.* Moreover, certain secured creditors would be required to vote their deficiency claims in favor of any future plan of reorganization. *Id.* at 940. The Fifth Circuit determined that the provision requiring the secured creditors to vote a portion of their deficiency claim to support any plan approved by a majority of the unsecured creditors' committee "thwarts the Code's carefully crafted scheme for creditor

---

[5] Although the court in *Decora* found that the proposed sale transaction was not a "sub rosa" plan, it did indicate that it was persuaded to approve the transaction because a liquidating plan would be proposed to effect distributions under the Bankruptcy Code. *Id.*

enfranchisement where plans of reorganization are concerned." *Id.* The Fifth Circuit held that such a sale could not be approved under section 363(b) because it would dictate the terms of any future plan of reorganization but would not have provided creditors with the procedural protections of a plan. *Id.*

36. Any sale transaction that dictates essential terms of a future reorganization plan (and in turn, short circuit creditors' rights) must first be vetted through a plan approval process. This process is critical because it provides creditors with an arsenal of tools, including mandatory information disclosures and voting requirements under sections 1125 and 1126 of the Bankruptcy Code, examination under the best interest of creditors test under section 1129(a)(7) of the Bankruptcy Code, and the "safety net" of the absolute priority rule provided under section 1129(b)(2)(B) of the Bankruptcy Code. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

37. The proposed APA is a *sub rosa* plan because it dictates the disposition of assets just as a plan of reorganization would. Furthermore, the APA provides for the sale of all of the Debtors' valuable assets, leaving the estates with little possibility of pursuing a confirmable chapter 11 plan. Such an attempt to short circuit the plan confirmation process is fundamentally inconsistent with the Bankruptcy Code as such acts short change creditors' due process rights. This, in and of itself, is a sufficient reason to justify denying the Sale.

> **D. Administrative Expenses, Including those Arising under Section 503(B)(9), Must Be Addressed.**

38. The APA requires the Debtors to "use commercially reasonable efforts" to operate their businesses until the Closing, including incurring related expenses. *See* APA § 5.4. However, the Sale Motion ultimately fails to account for the liquidity needed to pay post petition operating expenses and fund distributions under a confirmable and feasible chapter 11 plan for the Debtors' estates. The Debtors are operating their businesses post petition as required under the APA. These operations are being conducted for the Lenders sole benefit. Accordingly, the Lenders should not be permitted to credit bid unless their bid includes a cash

component sufficient (a) to satisfy all of the Debtors' administrative expenses and priority claims, including any 503(b)(9) claims, as part of a chapter 11 plan, (b) to provide sufficient funding for the plan process and the expenses that will accrue during the post confirmation wind-down period, and (c) to provide for a recovery for unsecured creditors sufficient to fund a distribution under a confirmable and feasible chapter 11 plan.

39. This request is especially appropriate given that significant value exists in the Debtors' previously unencumbered assets, including avoidance actions under Chapter 5 Causes of Action, Estate Causes of Action, and potentially unencumbered assets of non-debtors. At a minimum, postpetition expenses incurred but unpaid by the Debtors at the time of the Sale Closing should be costs attributed to the Purchaser.

### E. Rather than Leave the Estates Administratively Insolvent, the Lenders Should Receive Stay Relief to Foreclose.

40. In the event the Lenders refuse to commit to making the estates administratively solvent and, the Committee would submit, provide for a recovery to unsecured creditors, then the Court should simply deny the Sale Motion and permit the Lenders to move for relief from the automatic stay under section 362 of the Bankruptcy Code.

41. A state court process is often longer, cumbersome, expensive, and more difficult to accomplish without management's cooperation. Moreover, it does not always result in a determination that the purchaser is obtaining the assets "free and clear" of all liens, claims an encumbrances. Accordingly, there is a greater likelihood that such a transfer is challenged on grounds such as commercial reasonableness, fraudulent transfer, and successor liability. However, if the Lenders choose not fund the costs of the chapter 11 process, then they should not be permitted a "free ride" and seek this relief in another forum.

### F. Insurance Policies, Chapter 5 Causes of Action and Estate Causes of Action Should Be Excluded from the Acquired Assets.

42. The APA includes several items in the list of Acquired Assets to be sold to the Buyer which should be removed, including Insurance Policies, Chapter 5 Causes of Action, and Estate Causes of Action. *See* APA at Art. I (definition of Acquired Assets).

43. With respect to Insurance Policies, the Committee objects to any policies related to officer and director coverage, errors and omissions (a/k/a professional liability coverage), and/or employment practices liability insurance and related insurance proceeds from being sold under the Sale. The Insurance Policies (and any recovery therefrom) are not property of the Debtors' estates. As such, the Insurance Policies (and any such recovery) should be made available for all of the Debtors' creditors, not solely the Lenders.[6] *Cf. In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512–13 (Bankr. D. Del. 2004) (when an estate cause of action is brought on behalf of the debtor against directors and officers, "the courts generally hold that the debtor is merely an indirect insured and the proceeds [of the D&O policy] are not property of the estate.").

### G. The "Material Adverse Effect" Clause Is too Broad and Should Be Eliminated.

44. The Committee requests that the concept of "Material Adverse Effect" be removed from the APA altogether. *See* APA at Art. I (definition of "Material Adverse Effect"). The proposed Buyer is not an independent third party with little knowledge of the Debtors' operations. Instead, the Buyer is either the Debtors' Prepetition Lender or a designee. Further, the Lenders should not be in a position to provide inadequate liquidity through a very stringent DIP Facility and then be permitted to claim a "material adverse" change has occurred that allows the Lenders to terminate the Sale without repercussion or any remedy for the estates.

45. The Lenders are fully familiar with the Acquired Assets, proposed a discounted Purchase Price which reflects that knowledge, and should be bound to acquire the Acquired Assets on an "as is where is" basis.

### H. The Purchase Price per Acquired Asset Is Unclear and Speculative.

46. The APA's definition of Consideration does not attribute any portion of the Purchase Price to any particular set of Acquired Assets. *Id.* at § 2.5(b). The Prepetition Agent,

---

[6] The Committee does not object to the sale of Insurance Policies (and proceeds thereof) from a particularly policy that covers property damage or and/or any losses relating to operating assets incurred after the Sale closes.

in its sole discretion, may sell one or more lots of Acquired Assets without disclosing rudimentary information such as the starting bid or upset price for individual lots of Acquired Assets. The Prepetition Agent is also not required to disclose the amount of the "Assumed Liabilities" associated with each lot. For these reasons, the definition of Consideration should be modified to require that the Purchase Price be allocated by lot.

### I. The Committee Should Be Involved in all Discussions and Determinations with Respect to Purchase Price Allocation.

47. The APA provides that the "Seller and Buyer shall jointly ... prepare an allocation of the Purchase Price (and all other capitalized costs) amount the Acquired Assets[.]" *Id.* at § 2.9. The Committee should be involved in this process as this allocation may have a significant impact on the Purchase Price and may create liabilities for the Debtors' estates.

### J. Other Modifications to Purchase Agreement

48. *Appeal Should Not Be a Termination Cause*. The Committee also requests that a successful bidder for the Acquired Assets not be permitted to terminate the APA should any order approving the Sale be appealed. *Id.* at § 7.1(e). The APA is currently unclear on this point.

49. *Access to Books and Records*. Currently, the Purchaser may limit access to the Debtors' prepetition books and records if it determines that such access is unnecessary. *Id.* at § 6.3. It is unclear at this time, when and if records may be needed by the Debtors and their representatives and for how long. Accordingly, the APA must be modified to provide the Committee and/or other estate representatives with unfettered access to the Debtors' books and records post-Closing.

50. *Committee Confidentiality Agreements Must Be Excluded from Acquired Assets*. The definition of "Acquired Assets" also includes the Debtors' rights under any non-disclosure, confidentiality, non-compete, and/or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of Seller. *Id.* at Art. I (definition of Acquired Assets at (j) and (m)). The Acquired Assets should exclude any

confidentiality agreements with the Committee, any individual Committee member and/or the respective professionals, agents or consultants.

## RESERVATION OF RIGHTS

51. The Committee reserves the right to assert additional Lien Challenges and Sale Objections at or prior to any hearing to approve the Sale whether or not such challenges and/or objections have been raised herein.

**WHEREFORE**, the Committee respectfully requests that the Court (i) enter an order in accordance with the relief requested herein and (ii) grant such other and further relief as the Court deems just and proper.

Dated: May 14, 2015
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Jaime Luton Chapman
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Jaime Luton Chapman (No. 4936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Sharon L. Levine, Esquire
Cassandra Porter, Esquire
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

*Counsel for the Official Committee of Unsecured Creditors*